DMP:CRH/JAM/JGH
F.#2020R00515

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                                                    Docket No. 20-CR-326 (RPK)

DZENAN CAMOVIC,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

<u>THE GOVERNMENT'S RESPONSE IN OPPOSITION TO THE
DEFENDANT'S MOTIONS TO DISMISS AND SUPPRESS EVIDENCE</u>

                                      JACQUELYN M. KASULIS
                                      Acting United States Attorney
                                      Eastern District of New York

Craig R. Heeren
Artie McConnell
Josh Hafetz
Assistant U.S. Attorneys
    (Of Counsel)

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................................ i

TABLE OF AUTHORITIES .............................................................................................................. i

PRELIMINARY STATEMENT .......................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................................. 4

    I.     The Defendant's Background and Offense Conduct ....................................................... 4

    II.    Recovery and Search of the Defendant's Cell Phone ....................................................... 6

    III.   The Search of the Defendant's Apartment .................................................................... 9

THE GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS ..... 16

    I.     The Indictment Fully Comports with the Commerce Clause
         and Applicable Precedent ................................................................................................ 17

        A.    Applicable Law ........................................................................................................ 17

            1.    Commerce Clause Application to Hobbs Act Robbery .......................................... 17

            2.    Robbery of Entities in Interstate Commerce and Depletion of Assets ................... 18

        B.    Argument .................................................................................................................. 19

    II.    The Defendant's Challenge to Count Three Is
         Precluded by *Scarborough v. United States* .................................................................. 23

        A.    Applicable Law ........................................................................................................ 23

        B.    Argument .................................................................................................................. 24

    III.   Hobbs Act Robbery Is Categorically a Crime of Violence
         for Purposes of 18 U.S.C. § 924(c) ............................................................................... 25

        A.    Applicable Law ........................................................................................................ 25

        B.    Argument .................................................................................................................. 25

    IV.   Count Two Is Not Duplicitous ...................................................................................... 26

        A.    Applicable Law ........................................................................................................ 26

        B.    Argument .................................................................................................................. 28

THE GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS .. 30

    I.     Law Enforcement's Entry into the Apartment Was Lawful ........................................ 30

        A.    Applicable Law ........................................................................................................ 30

             1.    Consent .................................................................................................................... 30

            2.    Exigent Circumstances ............................................................................................ 33

        B.    Argument .................................................................................................................. 34

             1.    Husejin Camovic Provided Consent To Enter the Apartment ............................... 34

            2.    Exigent Circumstances Warranted a Warrantless Entry into the Apartment .......... 36

II.   Law Enforcement Properly Secured the Apartment, Their Presence and Conduct Was Reasonable, and Husejin Camovic's Additional Consent to Search Was Valid ........... 38

    A.   Applicable Law.................................................................................................... 38

    B.   Argument ............................................................................................................. 39

III.  Any Evidence Recovered from the Apartment Was Inevitably Discoverable .............. 43

    A.   Applicable Law.................................................................................................... 43

    B.   Argument ............................................................................................................. 44

CONCLUSION.................................................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**

Belflower v. United States,
129 F.3d 1459 (11th Cir. 1997) ........................................................................................ 21

Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,
520 U.S. 564 (1997).......................................................................................................... 21

Dalessandro v. County of Nassau,
758 F. App'x 165 (2d Cir. 2019) ...................................................................................... 33

Edwards v. Superintendent, Southport C.F.,
991 F. Supp. 2d 348 (E.D.N.Y. 2013) ............................................................................. 40

Fernandez v. California,
571 U.S. 292 (2014) .......................................................................................................... 31

Florida v. Jardines,
569 U.S. 1 (2013)......................................................................................................... 31, 34

Florida v. Jimeno,
500 U.S. 248 (1991).......................................................................................................... 32

Harris vs. United States,
No. 09-CV-4380 (ARR), 2010 WL 2710600 (E.D.N.Y. July 6, 2010)......................... 2, 27, 28

Illinois v. McArthur,
531 U.S. 326 (2001).......................................................................................................... 38

Jones v. United States,
529 U.S. 848 (2000)...................................................................................................... 19, 22

Kaupp v. Texas,
538 U.S. 626 (2003)...................................................................................................... 32, 33

Kentucky v. King,
563 U.S. 452 (2011)...................................................................................................... 33, 35

Kirk v. Louisiana,
536 U.S. 635 (2002).......................................................................................................... 33

Krause v. Penny,
837 F.2d 595 (2d Cir. 1988) ............................................................................................. 32

Lawson v. Hilderbrand,
642 F. App'x 34 (2d Cir. 2016) ........................................................................................ 38

Lewis v. United States,
385 U.S. 206 (1966).......................................................................................................... 35

Missouri v. McNeely,
569 U.S. 141 (2013).......................................................................................................... 33

Moore v. Andreno,
505 F.3d 203 (2d Cir. 2007) ............................................................................................. 31

Nix v. Williams,
    467 U.S. 431 (1984) .................................................................................. 43, 44, 45

Payton v. New York,
    445 U.S. 573 (1980) .............................................................................................. 31

Phillips v. County of Orange,
    894 F. Supp. 2d 345 (S.D.N.Y. 2012) ................................................................. 43

Scarborough v. United States,
    431 U.S. 563 (1977) ......................................................................................... 1, 23

Schneckloth v. Bustamonte,
    412 U.S. 218 (1973) .................................................................................. 31, 34, 41

Segura v. United States,
    468 U.S. 796 (1984) ...................................................................................... 38, 39

Seifert v. Rivera,
    933 F. Supp. 2d 307 (D. Conn. 2013) .......................................................... 32, 35

Stirone v. United States,
    361 U.S. 212 (1960) .............................................................................................. 17

Turner v. United States,
    396 U.S. 398 (1970) ...................................................................................... 26, 29

United States v. Alejandro,
    368 F.3d 130 (2d Cir. 2004) ................................................................................ 35

United States v. Arango–Correa,
    851 F.2d 54 (2d Cir. 1988) .................................................................................. 36

United States v. Barrett,
    No. 10-CR-809 (KAM), 2011 WL 6780901 (E.D.N.Y. Nov. 27, 2011) .......... 27, 29

United States v. Cabassa,
    62 F.3d 470 (2d Cir. 1995) ............................................................................ 43, 44

United States v. Cacace,
    796 F.3d 176 (2d Cir. 2015) ................................................................................ 41

United States v. Combs,
    369 F.3d 925 (6th Cir. 2004) ......................................................................... 26, 27

United States v. Crisci,
    273 F.3d 235 (2d Cir. 2001) ................................................................................ 29

United States v. Delva,
    858 F.3d 135 (2d Cir. 2017) .......................................................................... 33, 37

United States v. Deutsche,
    987 F.2d 878 (2d Cir. 1993) ................................................................................ 32

United States v. Discala,
    No. 14-CR-399 (ENV), 2018 WL 1187394 (E.D.N.Y. Mar. 6, 2018) ................. 40

United States v. Droms,
  566 F.2d 361 (2d Cir. 1977) .................................................................................. 27

United States v. Dzionara-Norsen,
  19 CR 6131G, 2020 WL 1897179 (W.D.N.Y. Apr. 17, 2020)................................ 37

United States v. Eng,
  997 F.2d 987 (2d Cir. 1993) .................................................................................. 43

United States v. Fabian,
  312 F.3d 550 (2d Cir. 2002) .................................................................................. 17

United States v. Farrish,
  122 F.3d 146 (2d Cir. 1997) .................................................................................. 18

United States v. Garcia,
  56 F.3d 418 (2d Cir. 1995) .................................................................................... 31

United States v. Garcia,
  94 F.3d 57 (2d Cir. 1996) ...................................................................................... 23

United States v. Grant,
  375 F. App'x 79 (2d Cir. 2010) ........................................................................ 32, 35

United States v. Haynes,
  582 F.3d 686 (7th Cir. 2009) ............................................................................ 27, 28

United States v. Heath,
  455 F.3d 52 (2d Cir. 2006) ............................................................................... 43, 46

United States v. Helmsley,
  941 F.2d 71 (2d Cir. 1991) ............................................................................... 27, 29

United States v. Hernandez,
  19-CR-097 (VM), 2020 WL 3257937 (S.D.N.Y. June 16, 2020) .......................... 35

United States v. Hill,
  890 F.3d 51, 53 (2d Cir. 2018) ......................................................................... 2, 25

United States v. Jamison,
  299 F.3d 114 (2d Cir. 2002) ............................................................................. 17, 18

United States v. Jones,
  30 F.3d 276 (2d Cir. 1994) ............................................................................... 19, 20

United States v. Laton,
  352 F.3d 286 (6th Cir. 2003) ................................................................................ 21

United States v. Lloyd,
  462 F.3d 510 (6th Cir. 2006) ........................................................................... 27, 28

United States v. Lopez,
  514 U.S. 549 (1995)......................................................................................... 19, 24

United States v. Lopez,
  937 F.2d 716 (2d Cir. 1991) ............................................................................. 38, 39

United States v. Lopez,
    97-CR-483 (RPP), 1997 WL 790582 (S.D.N.Y. Dec. 24, 1997) ...................................... 32, 35

United States v. MacDonald,
    916 F.2d 766 (2d Cir. 1990) ............................................................................................... 34

United States v. Mahon,
    804 F.3d 946 (9th Cir. 2015) ...................................................................................... 22, 23

United States v. Matlock,
    415 U.S. 164 (1974) ...................................................................................................... 31, 34

United States v. McCoy,
    995 F. 3d 52 (2d Cir. 2021) ............................................................................................ 2, 25

United States v. McGee,
    564 F.3d 136 (2d Cir. 2009) ............................................................................................. 31

United States v. Mendoza,
    677 F.3d 822 (8th Cir. 2012) ............................................................................................ 36

United States v. Miles,
    889 F.2d 382 (2d Cir.1989) ............................................................................................... 39

United States v. Moreno,
    701 F.3d 64 (2d Cir. 2012) ......................................................................................... 33, 41

United States v. Morrison,
    529 U.S. 598 (2000) .......................................................................................................... 19

United States v. Munoz,
    987 F. Supp. 2d 438 (S.D.N.Y. 2013) ..................................................................... 32, 39, 40

United States v. Murphy,
    193 F.3d 1 (1st Cir. 1999) ................................................................................................. 20

United States v. Murray,
    618 F.2d 892 (2d Cir. 1980) ............................................................................................. 26

United States v. O'Brien,
    926 F.3d 57 (2d Cir. 2019) ........................................................................................ 32, 36

United States v. Parkes,
    497 F.3d 220 (2d Cir. 2007) ............................................................................................. 17

United States v. Patton,
    451 F.3d 615 (10th Cir. 2006) .......................................................................................... 24

United States v. Perrotta,
    313 F.3d 33 (2d Cir. 2002) ......................................................................................... 18, 19

United States v. Pollaro,
    733 F. Supp. 2d 364 (E.D.N.Y. 2010) ...................................................................... 35, 36, 43

United States v. Pugh,
    No. 15-CR-116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) ............................... 29

iv

United States v. Rodriguez-Casiano,
  425 F.3d 12 (1st Cir. 2005) .................................................................................. 18

United States v. Rose,
  891 F.3d 82 (2d Cir. 2018) .................................................................................. 17

United States v. Savoires,
  430 F.3d 376 (6th Cir. 2005) .......................................................................... 27, 28

United States v. Schaefer,
  859 F. Supp. 2d 397 (E.D.N.Y. 2012) ................................................................. 42

United States v. Segura,
  663 F.2d 411 (2d Cir. 1981) ................................................................................ 44

United States v. Smith,
  688 F.3d 730 (11th Cir. 2012) ............................................................................. 39

United States v. Snype,
  441 F.3d 119 (2d Cir. 2006) ................................................................................ 31

United States v. Sorrentino,
  72 F.3d 294 (2d Cir. 1995) .................................................................................. 23

United States v. Stewart,
  433 F.3d 273 (2d Cir. 2006) ................................................................................ 29

United States v. Stewart,
  No. 08 CR 720, 2009 WL 2149603 (N.D.Ill. July 17, 2009) ................................ 27

United States v. Stokes,
  733 F.3d 438 (2d Cir. 2013) .......................................................................... 43, 44

United States v. Sturdivant,
  244 F.3d 71 (2d Cir. 2001) ........................................................................ 26, 28, 29

United States v. Vasquez,
  638 F.2d 507 (2d Cir. 1980) ................................................................................ 36

United States v. White,
  256 F. App'x 333 (11th Cir. 2007) ....................................................................... 22

United States v. Whitehorn,
  829 F.2d 1225 (2d Cir. 1987) .......................................................................... 45, 46

United States v. Wilson,
  11 F.3d 346 (2d Cir. 1993) ............................................................................. 34, 41

United States v. Wilson,
  914 F. Supp. 2d 550 (S.D.N.Y. 2012) .................................................................. 40

**Statutes**

18 U.S.C. § 1001 .................................................................................................... 29

18 U.S.C. § 1344 .................................................................................................... 29

18 U.S.C. § 1951(a) ................................................................................................ 17

18 U.S.C. § 924(l) .................................................................................................. 24, 25

Pub.L. No. 90–351, 82 Stat. 197 (1968) .................................................................. 23

**Other Authorities**

Ali Winston, "Stationed Overseas, but Solving Crimes in New York City," New York Times, Aug. 21, 2018.................................................................................................. 20

Katie Brenner and Adam Goldman, "F.B.I. Finds Link Between Pensacola Gunman and Al Qaeda," New York Times, May 18, 2020 ................................................................. 37

NYPD Intelligence Bureau, New York City Police Department website .................................... 20

**Rules**

Fed. R. Crim. P. 7(c) ................................................................................................ 26

Fed. R. Crim. P. 8(a) ................................................................................................ 26

**Constitutional Provisions**

U.S. CONST. amend. IV.............................................................................................. 30

PRELIMINARY STATEMENT

The defendant, Dzenan Camovic, is charged in a four-count indictment (the "Indictment") with robbery and firearms offenses arising out of his stabbing, robbery and shooting of members of the New York City Police Department ("NYPD") on the night of June 3, 2020 in Brooklyn. The defendant has also been charged by a Brooklyn state grand jury with several New York State crimes, including multiple counts of attempted murder in the first degree, attempted murder of a police officer, aggravated assault and several weapons offenses. The government respectfully submits this memorandum of law in opposition to (i) the defendant's motion to dismiss the indictment; and (ii) the defendant's motion to suppress evidence obtained during a search of his family home in Brooklyn, New York (collectively, "defendant's motions"). ECF Docket Nos. 18 and 19.

The defendant's motion to dismiss all four counts in the indictment should be denied in its entirety. The defendant moves to dismiss Count Three, which charges theft of a firearm that has moved in interstate commerce (18 U.S.C. § 924(l)), on the basis that it is an unconstitutional application of the Commerce Clause power. But the defendant's conduct is well-within the bounds of the Commerce Clause. The defendant robbed an official of the NYPD, the largest police department in the United States and an entity that regularly operates in interstate and international commerce, and robbed it of a firearm that the NYPD necessarily will have to replace by engaging in further interstate commerce. Courts have repeatedly held that crimes against municipal entities, even arguably de minimis criminal conduct, implicates interstate commerce, and this case is no different. The defendant's argument is also foreclosed by Scarborough v. United States, 431 U.S. 563 (1977), and its progeny, which have held that the nexus between the firearm and commerce is met when the government can prove the relevant firearm previously traveled in interstate commerce.

1

The defendant also argues that Count One, charging Hobbs Act Robbery, (18 U.S.C. § 1951(a)), and Count Four, charging unlawful possession of a firearm and ammunition by an unlawful alien, (18 U.S.C. § 922(g)(5)(A)), is likewise unconstitutional under the Commerce Clause.  As the defendant concedes, however, Scarborough and controlling circuit precedent preclude this argument for any purpose except to preserve appellate rights.

Lastly, the defendant argues that Count Two, which charges possessing, brandishing and discharging a firearm in furtherance of a crime of violence (18 U.S.C. § 924(c)), should be dismissed because the underlying crime, Hobbs Act Robbery, is not a crime of violence, and because Count Two is duplicitous because it charges both "use and carrying" and "possession" parts of the statute.  These arguments are without merit.  The Second Circuit has held that Hobbs Act Robbery is a crime of violence under Title 18, United States Code, Section 924(c).  See United States v. Hill, 890 F.3d 51, 53 (2d Cir. 2018); United States v. McCoy, 995 F. 3d 52 (2d Cir. 2021). With regard to duplicity, as several courts have held, an indictment can permissibly charge both prongs of Section 924(c) in a single count.  See, e.g., Harris vs. United States, No. 09-CV-4380 (ARR), 2010 WL 2710600 (E.D.N.Y. July 6, 2010).  Even if this Court were to conclude the charge was duplicitous, there are several appropriate pre-trial remedies available to avoid any potential prejudice short of the drastic decision to dismiss a count in the indictment.

Separately, the defendant moves to suppress evidence obtained from the apartment of the defendant's family, and any evidence allegedly derived from the fruits of that search.  The defendant argues that the search was unlawful because the written consent provided by the defendant's father was involuntary and coerced.  The facts demonstrate that the evidence was obtained lawfully.  The defendant's father voluntarily consented to the initial entry of law enforcement agents into his apartment.  After they entered the apartment, the defendant's family

spoke to law enforcement, and never requested that they leave.  Once inside the apartment, the officers lawfully remained while they attempted to obtain a search warrant of the residence.  And only after the defendant's father asked whether there was some way to speed up the process did law enforcement suggest he could consent to search the apartment, and had him do so in writing that made clear he was under no obligation to consent. And, in any event, the evidence would be admissible under the inevitable discovery doctrine.

Accordingly, both of the defendant's motions should be dismissed.

FACTUAL BACKGROUND

The government expects to establish the following facts at trial through witness and expert testimony, computer evidence, records of communications on social media, physical and documentary evidence, and the defendant's admissions to law enforcement and third parties.[1]

I.      The Defendant's Background and Offense Conduct

The defendant is a 20-year-old resident of Brooklyn, New York. He is a Bosnian national who was born in Germany. He has no legal immigration status in the United States.[2] While in New York, the defendant studied at the New York City College of Technology and held various construction and maintenance jobs. He has no known criminal history.

In early June 2020, New York City was under a nightly curfew order from 8:00 p.m. until 5:00 a.m. in response to social unrest after a series of demonstrations took place throughout the city. As a result of the demonstrations, hundreds of New York City Police Department ("NYPD") officers were deployed throughout the City to help enforce the curfew, including in Brooklyn.

On the evening of June 3, 2020, at approximately 11:30 p.m., the defendant walked past two uniformed NYPD officers standing near 885 Flatbush Avenue, near the corner of Church Avenue. The two officers were assigned to a post that evening. Video footage shows that, after walking past the officers, the defendant walked down the street and appeared to crouch for approximately eight minutes. The defendant then stood up, lingered briefly and then headed back

---

[1]      Unless expressly consented to herein, the government objects to the factual allegations in the defendant's memorandum in support of his motion, which represent a selective and misleading recitation of the record in this case. Because this submission is intended to address the instant motions, it does not set forth all of the facts and evidence that the government will seek to introduce at trial. Where the content of statements, written communications or documents are described herein, they are done so in pertinent part and in sum and substance, unless otherwise indicated. Any translations from a foreign language into English are in draft form and subject to revision.

[2]      The United States Department of Homeland Security has informed the government that, as a result of the defendant's unlawful status in the United States, an immigration detainer has been lodged against him.

4

toward the police officers. At approximately this time, the defendant sent a text message to a friend stating "I[']ll be a while." Video footage shows that the defendant then squared an entire block in an apparent effort to approach the two police officers from behind.

At approximately 11:50 p.m., the defendant turned onto Church Avenue, where the two NYPD officers stood on patrol. Upon turning the corner in the direction of the police officers, the defendant immediately took a knife he was holding and stabbed one of the officers in the neck. After stabbing and wounding the first officer ("Officer 1"), the defendant started chasing the second officer ("Officer 2"), violently lunging at him, and eventually throwing the knife, in an attempt to stab the officer. The defendant then ran back toward Officer 1 and attacked him again. A struggle ensued, and the defendant fought to take control of Officer 1's service weapon. Ultimately, the defendant forcibly gained possession of Officer 1's service weapon, thereby robbing the officer of his firearm. Using the officer's firearm, the defendant fired multiple shots at the police, including at additional officers who had responded to the scene. Responding officers ultimately shot the defendant and took him into custody. Several officers were wounded during the course of the defendant's attack and robbery, including Officer 1, who was stabbed, and Officer 2, who was shot in the hand.

During his attack on the NYPD officers, the defendant yelled "Allahu Akbar." The phrase "Allahu Akbar" is an Arabic expression usually translated as "God is the greatest" and is commonly used among Muslims to connote a positive event. However, the phrase has also repeatedly been exclaimed by perpetrators of jihadist terror attacks around the world during the commission of such attacks.[3]

---

[3]     For example, according to public reports, in October 2017, after ramming a pickup truck through numerous people on the bike path adjacent to Manhattan's West Side highway, Sayfullo Saipov exited the truck and shouted "Allahu Akbar" as he ran around waving a pellet gun and paintball gun. Saipov later admitted that watching

Immediately after the shooting, the defendant was transported from the crime scene to Kings County Hospital where he received treatment for multiple gunshot wounds.  Several days later, while the defendant was recovering in the hospital's intensive care unit, the defendant told a medical professional, in sum and substance, that he had killed two police officers and "my religion made me do it."

II.       Recovery and Search of the Defendant's Cell Phone

Law enforcement officers searched the defendant incident to his arrest, immediately after the aforementioned attack, during which time they recovered an LG cellular phone (the "the Camovic LG Phone").  Phone records and other evidence showed that the defendant used the Camovic LG Phone to exchange multiple text messages with several individuals on June 3, 2020, including immediately prior to his attack on police officers.

Specifically, earlier on June 3, 2020, hours before his attack, the defendant had dinner with two associates in Brooklyn (hereinafter "Individual 1" and "Individual 2").  After dinner, the three individuals separated.  Toll records for the Camovic LG Phone, as well as text messages and additional information provided to law enforcement by Individual 1, indicate that at approximately 11:09 p.m. (less than an hour before the defendant's attack), the defendant texted Individual 1 asking about Individual 1's whereabouts.  Individual 1 responded that he would be home soon and then wrote, apparently in reference to a prior incident, "Wut up. Btw that shooting that u said, [Individual 2] called me B4 and said that cops came to him for cameras.  Some guy

---

terrorist propaganda videos inspired him to commit this terrorist attack, which killed eight people and injured eleven. Notably, foreign terrorist organizations like ISIS have counseled followers to commit acts of violence using knives and other crude weapons, and have publicly released videos and other materials that demonstrate how to kill people using knives, explicitly calling for such attacks in the United States.  These directives have been repeatedly carried out by followers of ISIS and other foreign terrorist organizations, and ISIS directed followers to take advantage of the 2020 social unrest in the United States to commit acts of violence and further inflame tensions.  For example, on "Shamukh," which is an ISIS-related forum on the dark web, a series of threads on or about May 31, 2020, just days before the defendant's attack, urged supporters in the United States to exploit current social tensions by carrying out physical attacks against law enforcement and protesters to sow further discord.

killed to ppl."   The defendant responded "damb" and informed Individual 1 that he was on Ocean Avenue, near Individual 1's home.  Individual 1 then responded "U waiting for me? Imma be there in like 5."  The defendant responded "kk." and then, at 11:38 p.m.—approximately 12 minutes before his attack on police—the defendant wrote, "Ill be a while."  Toll records for the phone number associated with the Camovic LG Phone further show that, in addition to his communications with Individual 1 immediately before the attack, the defendant also used the Camovic LG Phone to exchange multiple text messages with another individual ("Individual 3") in the hours before the attack.  Specifically, toll records for the phone number associated with the Camovic LG Phone show that the defendant used the Camovic LG Phone to exchange approximately five text messages with Individual 3 between approximately 7:00 and 10:00 p.m. on June 3, 2020.

Based on these and other facts presented in a search warrant application, on June 4, 2020 at approximately 9:22 p.m., Magistrate Judge Steven M. Gold of the Eastern District of New York authorized a warrant to search the Camovic LG Phone.  See 20-MJ-411.  A review of the Camovic LG Phone revealed that the defendant downloaded and used an application to access the Tor network[4] (the "Tor App") on or about June 1, 2020—two days prior to his attack.  The defendant appears to have connected and used the Tor App on several occasions thereafter.  On or about June 2, 2020 at approximately 10:00 p.m. – less than 24 hours before the attack – the defendant deleted the Tor App.

---

[4]    Tor is a computer network designed to facilitate anonymous communication over the Internet.  The Tor network, commonly known as the "dark web," accomplishes this by routing a user's communications through a globally distributed network of relay computers, or proxies, rendering ineffective any conventional Internet Protocol ("IP") address-based methods of identifying users. To access the Tor network, a user installs specific Tor software. The Tor network also enables users to operate hidden sites that operate similarly to conventional websites.  The Tor network permits a user to conduct internet activity with a high degree of privacy and anonymity.  As a result, the network is often used by individuals involved in criminal activity that want to obscure their identity and evade law enforcement.

Additionally, the review of the Camovic LG Phone indicated that the defendant downloaded and used a social media application that allows users to send and receive information about local events associated with law enforcement activity (the "Law Enforcement App").[5]  The defendant downloaded the Law Enforcement App on or about June 2, 2020 and accessed it on several occasions prior to his attack, including on June 3, 2020, shortly before the attack on law enforcement.  Additionally, according to records provided by the company that operates the Law Enforcement App, the defendant's service began on or about May 26, 2018—approximately 14 months before the Camovic LG Phone was first activated according to telephone company record—which indicates that the defendant utilized the Law Enforcement App on one or more previous mobile devices, in addition to the Camovic LG Phone.

Also on the Camovic LG Phone was an application for Discord, an internet-based communications platform.  Discord is an application and digital distribution platform designed for creating communities ranging from gamers to education and businesses.  Discord specializes in text, image, video and audio communication between users in a chat channel and allows users to send direct messages to each other.  Discord has both a desktop application and a mobile application, and the service can also be accessed from a website.  Information subsequently provided to law enforcement by Discord revealed that the defendant had a Discord account that he actively used prior to the attack.

---

[5]    According to its website, the Law Enforcement App describes itself as a "safety app that give you instant access to verified 911 information."  A user of the Law Enforcement App located in or around the New York City region would receive alerts and information pertaining to NYPD activity.  In particular, during the relevant time period, a user of the Law Enforcement App would have received information about NYPD activity related to the ongoing protests, looting and civil disorder.  The Law Enforcement App also allowed users to submit and upload information and videos pertaining to such activity.  The Law Enforcement App provided mapping and location information for these events, and so a user would be able to learn about locations where NYPD officers were present.

8

III.    The Search of the Defendant's Apartment

Immediately after the attack, the defendant was taken into custody and transported to the hospital.  Responding law enforcement officers determined his identity and residence, located at ███████████████████████ Brooklyn, New York 11226 ("the Apartment").  Law enforcement officers, including members of the NYPD and the Federal Bureau of Investigation's ("FBI") Joint Terrorism Task Force ("JTTF"), were dispatched to the Apartment, with the first officers arriving on June 4, 2020 at approximately 1:30 a.m.[6]  Specifically, four officers were dispatched from the crime scene to the Apartment.  One of the responding officers rang the buzzer for the Apartment.  The defendant's father, Husejin Camovic, answered and buzzed the officers into the building.  One of the officers then knocked on the Apartment door, identified themselves as police officers to Husejin Camovic, advised that there had been an incident involving his son, the defendant, and asked to speak with him inside the apartment.  Husejin Camovic, who was able to communicate in English, allowed the four officers to enter the Apartment.

Once inside, the officers noted that the only other occupant of the apartment at that time was Husejin Camovic's daughter, Dzenna Camovic.  Husejin Camovic was calm and responsive to questioning, which focused on general background information about his son, as well as his son's whereabouts and activities during the day.  Given that the situation remained fluid and law enforcement had limited information, the responding law enforcement officers did not provide Husejin Camovic with any details regarding the defendant or the investigation at that time. While at times Husejin Camovic expressed apprehension and concern about the lack of

---

[6]    Law enforcement officers who responded to the Apartment maintained communication with NYPD officers and JTTF agents who responded to and remained at the crime scene, with those responding to the Apartment being provided regular updates regarding the attack, crime scene processing and other investigatory developments. Specifically, those responding to the Apartment were informed that the Camovic LG Phone had been recovered, and were also provided a description and photograph of the knife used in the attack.

9

information the officers provided, he remained cooperative, and at no point did he request that law enforcement personnel leave the apartment. In conversation with the officers, Husejin Camovic indicated that, due to the COVID-19 pandemic, the family – including the defendant – had largely been staying at a family home in Jeffersonville, New York (the "Jeffersonville Home") that he had purchased in 2019. Per Husejin Camovic, the defendant had only returned to Brooklyn on or about June 1, 2020. This was consistent with IP address information from the defendant's Discord account, as described above, which indicated that the defendant was at the Jeffersonville Home and using an internet capable device as recently as June 1, 2020. Husejin Camovic further informed law enforcement that several electronic devices were located at the Jeffersonville Home, including an Apple Macbook Pro laptop computer, an Apple desktop computer, and an Apple iPad, but that he was unsure if the defendant had used them.[7] The reports summarizing two JTTF interviews with Husejin Camovic in the Apartment are attached hereto as Exhibits A and B.

Huseijin Camovic stated that there was "nothing to hide" in the Apartment and that the officers could search the Apartment if they wished. Nevertheless, the officers did not engage in any search and made only plain view observations at that time. Notably, in the kitchen area was an open pantry where officers observed in plain view a knife matching the description of the knife the defendant used in the attack. Upon request, Husejin Camovic provided consent for agents to seize the knife as evidence, and a written consent form was subsequently executed. The consent

---

[7]    On June 9, 2020, Magistrate Judge Sanket M. Bulsara of the Eastern District of New York authorized a warrant to search the Jeffersonville Home. See 20-MJ-426. On June 10, 2020, law enforcement conducted a search of the Jeffersonville Home, which yielded no electronic devices. At or around the time of the search of the Jeffersonville Home, Husejin Camovic was contacted via phone by members of law enforcement. He advised law enforcement, in sum and substance and relevant part, that members of their family had removed electronic devices from the Jeffersonville Home back to the Apartment in Brooklyn sometime after June 4, 2020, subsequent to the government's search of the Apartment on June 4, 2020. As a result, on June 10, 2020, Magistrate Judge James Orenstein of the Eastern District of New York authorized a warrant to search the Apartment, whereupon several electronic devices were recovered. See 20-MJ-427.

form, signed by Husejin Camovic and attached hereto as Exhibit C, is entitled "CONSENT TO SEARCH" and permits law enforcement to search the kitchen pantry for the knife. The consent form further indicates that Husejin Camovic was advised of his right to refuse consent and that consent to search and seize any items was being given voluntarily.

One of the officers asked which room was the defendant's, and Husejin Camovic offered to let the officers search it. The officers did not perform a search of the room, but looked inside and observed several electronic devices and storage media in plain view.

At approximately 1:50 a.m., in the presence of law enforcement agents, Husejin Camovic called one of the defendant's friends to inquire about his whereabouts. At approximately 2:30 a.m., a sergeant with the NYPD's Force Investigation Division, was present in the apartment and spoke with Husejin Camovic. The sergeant recorded this conversation, which lasted for approximately twelve minutes. A copy of the recording is attached hereto as Exhibit D, and a draft transcript is attached as Exhibit E. After asking some background questions about the defendant, The sergeant asked Husejin Camovic about the defendant's room. Husejin Camovic directed the sergeant to the defendant's room and indicated that other law enforcement officers had previously viewed the room but had not taken anything. The sergeant then asked, "mind if I take a look?" and Husejin Camovic granted this request, responding "take a look." The sergeant then asked if he could "take a picture," and while there is no audible response on the recording, Husejin Camovic approved this request as well. However, the sergeant did not take any photographs, other than a photograph of Husejin Camovic's driver's license, which he produced on request. At approximately 3:45 a.m., officers at the Apartment were instructed to hold the location while a search warrant was sought.

At approximately 9:00 a.m., Husejin Camovic received a telephone call from a family member, who told him that a lawyer had been retained and instructed him not to speak further to law enforcement. In an abundance of caution, law enforcement officers ceased any case-related conversation with Husejin Camovic at that time.

At all times, Husejin Camovic remained calm, cooperative and responsive with law enforcement, even offering law enforcement officers places to sit and water to drink. He and his daughter were allowed to move freely throughout the apartment and use the bathroom, generally remaining in the foyer and living room areas. Dzenna Camovic returned to her bedroom at various points. When Husejin Camovic and Dzenna Camovic were in separate rooms, this was in order to respect their religious beliefs and to allow female agents to sit with Dzenna Camovic and male agents to remain with Husejin Camovic. At all times, they were permitted to speak to each other in English, pray, use the bathroom, or have food or beverages if requested. Husejin Camovic explained that he was fasting for religious reasons, and as such he did not ask for anything to eat. At no point did he or his daughter ask to leave the apartment or request that the agents leave the location. Generally, no more than two or three law enforcement officers were inside of the apartment at any given time, with other law enforcement personnel remaining outside of the Apartment in the building lobby or on the street.

On June 4, 2020, at approximately 5:20 p.m., Husejin Camovic provided JTTF agents with additional consent to search the apartment. Specifically, Husejin Camovic noted that it would be time for him to break his fast soon and he asked how much longer they would need to wait for the warrant. In response, he was advised that law enforcement was still in the process of drafting and obtaining a warrant, but that he could also consent to a search of the Apartment. Husejin Camovic stated that he did not know he could consent to a search and would have done

12

so earlier had he been so advised.  He then executed a consent form, attached hereto as Exhibit F, titled "CONSENT TO SEARCH" and which permits a "complete search of 580 E. 22nd Street, Apartment 5, Brooklyn, NY 11226, and all the contents therein."  The consent form further indicates that Husejin Camovic was advised of his right to refuse consent and that consent to search and seize any items was being given voluntarily.

During a search of the defendant's bedroom, which Husejin Camovic indicated that Husejin Camovic had regular access to, officers recovered approximately 21 compact discs ("CDs") or digital video discs ("DVDs") with labels consistent with violent jihadist propaganda or content.  Specifically, officers observed multiple CDs or DVDs marked "Abu Bakr," a possible reference to Abu Bakr al-Baghdadi, the now deceased self-proclaimed leader of ISIS.[8]  Officers also observed multiple CDs or DVDs marked "Anwar al-Awlaki," including one that also included the word "jihad."  Al-Awlaki was a United States-born radical Islamic cleric and prominent leader of the foreign terrorist organization al-Qaeda in the Arabian Peninsula who was killed on or about September 30, 2011.  Even now, approximately 10 years after his death, al-Awlaki is still commonly regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad.  These 21 CDs or DVDs were located together in the same box and labeled as follows:

- "Clearing the Fog: How to Respond to the Misconceptions About Islam" by "Yusha Evans."[9]

- "Weakness of Faith and Its Cures" by Yusha Evans;

- "Young Aisha – Imam Anwar al A'wlaqi;"

---

[8]    A subsequent review of the content of the discs pursuant to a search warrant has revealed that these discs are not related to al-Baghdadi.

[9]    Publicly available information identifies Yusha Evans as a radical Islamist preacher.

- "Abu Bakr 4" written in marker;

- "Abu Bakr 10" written in marker;

- Bosnian-language title, including "Hafiz Muhammed Porca;"[10]

- "Galaxia International Services Inc. Money Transmitter," accompanied by Arabic language script and an address in Queens;

- "Lives of the Prophets, Part 1, Anwar al- Awlaki;"

- "Lives of the Prophets, Volumes 3 and 4, Anwar al- Awlaki;"

- Bosnian-language words written in marker;

- "The Life of Muhammad" on a printed on a sticker;

- "Abu Bakr 5" written in marker;

- "Abu Bakr 14" written in marker;

- "Abu Bakr 9" written in marker;

- "Al-Iman" with Arabic script;

- A second disc reading "Al-Iman" with Arabic script;

- Bosnian-language print, including the words "il tewhid;";

- Arabic-language script with a graphic of the Ka'aba in Mecca;

- Bosnian-language print overlaid against a blue sky and grass background;

- "The Life of Abu Bakr" printed on a sticker;

- "Jihad Shaykh Anwar al Awlaki MP3 Borba" written in marker;

Law enforcement agents also discovered several electronic devices in the defendant's room, including the following:

- One black Samsung mobile phone, IMEI # 358689100215795

- One gold Samsung mobile phone, IMEI # 354255092268384

---

[10]   Publicly available information identifies Hafiz Muhammed Porca as a radical Islamist preacher.

14

- One Sandisk 64 GB hard drive

- One Kingston 4 GB hard drive

- One Samsung tablet, model SM-T520

- One silver iPhone, Model A1660, FCC ID #BCG-E308512

- One Polaroid tablet, model PMID1000B

- One voice recorder

- One iPhone

Agents also recovered two additional knives from the defendant's bedroom.

On or about June 5, 2020, Magistrate Judge Steven M. Gold of the Eastern District of New York authorized warrants to search the aforementioned electronic media. See 20-MJ-414 and 20-MJ-424. Analysis of these items showed that, prior to his June 3, 2020 robbery of and attack on the NYPD police officers, the defendant possessed a significant volume of materials that demonstrated his interest in and support for violent Islamist extremism. For example, one of the defendant's cellular telephones found in the Apartment contained an image with Arabic language stating "The Islamic State. Dabiq. Audios of the Caliphate. Dabiq." "Dabiq" is an official magazine of ISIS and was used by ISIS to radicalize and recruit followers. The defendant's phone also included an image of an Arabic language media logo superimposed over an ISIS-style flag, and an image with Arabic and English language that stated, "[t]he mujahid walks back to life after death." Notably, these images were found in the "carved" space of the phone, indicating they had been deleted or otherwise removed from the phone. Additionally, a thumb drive recovered from the defendant's bedroom also contained files with logos of al-Hayat Media Center, al-Ajnad and al-Bayan, which are all official ISIS media outlets, as well as images bearing Arabic-language logos which said "The Islamic State" and "Dabiq."

15

On August 26, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with the following crimes: (1) Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); (2) possessing, brandishing and discharging a firearm in furtherance of a crime of violence, to wit: the Hobbs Act robbery charged in Count One, in violation of 18 U.S.C. §§ 924(c)(i)-(iii) (Count Two); (3) theft of a firearm that has moved in interstate commerce, in violation of 18 U.S.C. § 924(l) (Count Three); and (4) possession of a firearm by a noncitizen illegally or unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5).

### THE GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS

The defendant moves for dismissal of the indictment, arguing that federal charges for the defendant's conduct "constitute an unconstitutional exercise of Congress's Commerce Clause power, and an intrusion into the police power of the State and the Tenth Amendment." ECF Docket No. 18, p. 2. In so moving, the defendant argues that the indictment charges "purely intrastate, local criminal activity." ECF Docket No. 18, p. 8. Additionally, the defendant makes a specific challenge to the jurisdictional element of Count Three, which charges a violation of 18 U.S.C. § 924(l), because the fact that "the firearm may have moved in commerce at some point in the past, before its theft, does not make its theft somehow within the sphere of commerce." Id. at p. 11. Next, the defendant argues that Count Two, charging a violation of 18 U.S.C. § 924(c)(1), is duplicitous, citing authority outside of the Second Circuit he claims stand for this proposition. In the alternative, the defendant argues that Count Two must be dismissed because Hobbs Act robbery – the predicate crime for the charged violation of § 924(c)(1) – is "categorically not a crime of violence." Id. at pp. 24-26. None of these arguments have merit and the defendant's motion should be denied in its entirety.

I.      The Indictment Fully Comports with the Commerce Clause and Applicable Precedent

      A.      Applicable Law

            1.      Commerce Clause Application to Hobbs Act Robbery

The jurisdictional element of the Hobbs Act requires that the government prove that the crime at issue, here the robbery or attempted robbery of an NYPD officer's gun, "affect[ed] commerce or the movement of any article or commodity in commerce."  18 U.S.C. § 1951(a). Since the Act prohibits certain conduct that affects commerce "in any way or degree," the Second Circuit has recognized that the broad language of the Hobbs Act expresses an intent by Congress to exercise its full power under the Commerce Clause.  See United States v. Jamison, 299 F.3d 114, 118 (2d Cir. 2002) ("The [Hobbs] Act 'speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.'") (quoting Stirone v. United States, 361 U.S. 212, 215 (1960)).

As a result, the Second Circuit has repeatedly held that the government has "only a minimal burden of proving a connection to interstate commerce," Jamison, 299 F.3d at 118, and that this burden may be satisfied by a showing of even a "very slight effect on interstate commerce," United States v. Fabian, 312 F.3d 550, 554 (2d Cir. 2002) ("[o]ur precedent requires the government make only a de minimis showing to establish the necessary nexus for Hobbs Act jurisdiction."); see also United States v. Parkes, 497 F.3d 220, 230 (2d Cir. 2007) (the jurisdictional element may be satisfied by showing a de minimis effect on interstate commerce).  In addition, the government need not show that the crime had an actual effect on interstate commerce; rather, "'all that need be shown is the possibility or potential of an effect on interstate commerce.'"  Parkes, 497 F.3d at 230 (quoting United States v. Arena, 180 F.3d 380, 390 (2d Cir. 1999)); see also United States v. Rose, 891 F.3d 82, 86 (2d Cir. 2018) (reiterating that the "required showing of an effect

17

on interstate commerce is de minimis" and that "[i]f the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under the Hobbs Act.").

2.    Robbery of Entities in Interstate Commerce and Depletion of Assets

When a business is robbed, the government must prove "a very slight effect on interstate commerce." United States v. Farrish, 122 F.3d 146, 148 (2d Cir. 1997) (citations omitted).  For example, it is sufficient to show that the business served out-of-state customers. See, e.g., id. (holding that element was met by showing that parking garage "regularly served cars bearing out-of-state license plates…and that the [g]arage is located near major access routes for cars crossing state lines").  An effect on interstate commerce can also be shown by evidence that the defendant's actions diminished the assets of the business and, therefore, lessened its capacity to compete in interstate commerce.  See, e.g., Jamison, 299 F.3d at 121 (upholding Hobbs Act conviction under a depletion-of-assets theory based on the attempted robbery of an individual because the money that was the subject of the robbery attempt belonged to two businesses engaged in interstate commerce); United States v. Rodriguez-Casiano, 425 F.3d 12, 13 (1st Cir. 2005) (evidence sufficient to prove cash stolen from personal residences of two businessmen depleted the assets of their businesses, which participated in interstate commerce, supporting finding that robberies affected interstate commerce).

The Second Circuit has held that a robbery of an entity, or even an individual, that "directly participated in interstate commerce" is sufficient for the Hobbs Act.  United States v. Perrotta, 313 F.3d 33, 37-38 (2d Cir. 2002) ("The jurisdictional nexus could be satisfied by showing that the victim directly participated in interstate commerce.").  Under that holding, a robbery of the NYPD—an entity that operates both transnationally and internationally—constitutes a Hobbs Act robbery.  Moreover, even if the robbery were viewed as a robbery of the

18

officer, rather than of the NYPD as a whole, the Second Circuit has held that a robbery of "a victim…targeted because of her status as an employee at a company participating in interstate commerce" is also sufficient to satisfy the Hobbs Act. Id. at 38.

B.      Argument

The defendant's reliance on the Supreme Court's decisions in United States v. Lopez, 514 U.S. 549 (1995) (firearm in a school zone), Jones v. United States, 529 U.S. 848 (2000) (arson of a private residence), and United States v. Morrison, 529 U.S. 598 (2000) (civil remedy provision of the Violence Against Women Act) is inapposite and ignores that his conduct affected interstate or international commerce in at least two ways. First, the conduct was against the NYPD, an entity that regularly operates in interstate (and international) commerce due to its presence in places around the country and the world. Second, by committing a robbery of an employee of the NYPD, the conduct constitutes a depletion-of-assets of an entity that conducts interstate business transactions and must necessarily purchase firearms from outside of New York State.

Decisions from the Second Circuit and elsewhere make clear that robbery of a member of the NYPD affects interstate commerce. Unlike the robbery of a private residence or private person, the robbery of the NYPD affects interstate commerce because the NYPD actively operates within the streams of interstate commerce in the course of its day-to-day operations. Indeed, several cases have already held that a crime against a local police department can affect interstate commerce. In United States v. Jones, 30 F.3d 276, 285 (2d Cir. 1994), an undercover NYPD officer engaging in a "buy and bust" operation was robbed of money by drug dealers. Under a depletion-of-assets theory, the Court reasoned that the loss of the stolen funds limited the amount of cocaine the officer would be able to purchase in the future, and that cocaine is a commodity that "came from outside of New York and would qualify as moving in interstate commerce." Id. at 285. The Second Circuit noted that an effect on commerce is sufficient "even

19

though the effect is not immediate or direct or significant, but instead is postponed, indirect and slight." Id. Here, the same depletion of assets rationale would be stronger. All of the service guns the NYPD purchases for its officers—including the one Camovic attempted to rob—necessarily travel in interstate commerce, including any replacement of lost, damaged or stolen firearms.

Similarly, in United States v. Murphy, 193 F.3d 1, 10 (1st Cir. 1999), the First Circuit held that a scheme to extort funds that should have been forfeited to the Boston Police Department ("BPD") had a sufficient interstate nexus because the BPD "made substantial purchases of goods and services in interstate commerce" and "the diversion of forfeited funds could hardly help but constrain the availability of operating funds at least in some minimal degree; and little is needed to satisfy the very low jurisdictional threshold." Murphy, 193 F.3d at 10. Here too, stealing a firearm from the NYPD and repeatedly discharging the weapon necessarily impacts their purchase of goods (in this case, firearms and ammunition) in interstate commerce. The fact that the particular harm may be de minimis is irrelevant. Jones, 30 F.3d at 285.

Yet beyond this, the NYPD is a unique, interstate entity. The NYPD has numerous police officers and other employees operating in an official capacity in several cities across the United States and multiple countries around the world as part of its counterterrorism program. See, e.g., NYPD Intelligence Bureau, New York City Police Department website ("Through its International Liaison Program, the Intelligence Bureau posts officers in law enforcement agencies in major cities around the world.")[11]; Ali Winston, "Stationed Overseas, but Solving Crimes in New York City," New York Times, Aug. 21, 2018 (discussing presence of NYPD officers in Washington D.C., Los Angeles, and fourteen cities in Europe, Asia, Australia and the Middle

---

[11]    Available at https://www1.nyc.gov/site/nypd/bureaus/investigative/intelligence.page (last visited Aug. 29, 2021).

20

East).[12]  The NYPD is the largest police department in the United States and, given its size and international presence, is more similar to an interstate or international business or government entity than a purely local municipal entity.  Thus, the NYPD has a genuine interstate and international footprint, and therefore has much more significant involvement in interstate commerce than the ordinary police department.  Accordingly, the case law described above holding that a crime against the police can affect interstate commerce applies with even greater force to the NYPD in the instant case.

Additionally, the fact that the NYPD is not a for-profit business does not alter this analysis:  the Supreme Court and federal appellate courts have made clear that non-commercial entities, such as non-profit organizations and municipalities, can affect interstate commerce.  See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 586 (1997) (explaining that there is no distinction between for-profit and not-for-profit entities in a Commerce Clause analysis because "[e]ntities in both categories are major participants in interstate markets."); United States v. Laton, 352 F.3d 286, 300 (6th Cir. 2003) (explaining that "Congress recognized that the provision of emergency services by municipalities can affect interstate commerce in the active sense of the phrase" and that "[g]overnment institutions also can affect interstate commerce when they provide core public services, such as police protection and emergency services").

Courts have found that arson of police or fire department property is covered by 18 U.S.C. § 844(i), which requires that the property be "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."  See Laton, 352 F.3d at 293-95 (holding that arson of fire department station affected interstate commerce); Belflower v. United States, 129 F.3d 1459, 1462 (11th Cir. 1997) (holding that bombing of deputy sheriff's automobile affected

_____

[12]    Available at    https://www.nytimes.com/2018/08/21/nyregion/terrorism-nypd-intelligence-crime html (last visited Aug. 29, 2021).

21

interstate commerce).  Similarly, in United States v. White, 256 F. App'x 333, 337-38 (11th Cir. 2007) (per curiam), the Eleventh Circuit upheld the defendants' conviction of multiple substantive Hobbs Act extortion counts which turned on the defendants' scheme to avoid paying traffic ticket fines to the local government.  Central to the holding was the showing that the money collected from such fines "went into the city's general fund, which was used to buy firearms, city automobiles, gasoline, and police cruisers" and that many of these items traveled in interstate commerce.  White, 256 F. App'x. at 337-38.  In upholding one of the several substantive Hobbs Act counts against one defendant, the Court found a sufficient interstate commerce nexus in the defendant's failure to pay a single $112 traffic ticket.  Id. at 338.

Finally, courts have clarified that the type of conduct at issue is distinguishable from a robbery of a private citizen.  In United States v. Mahon, a case involving the bombing of a City of Scottsdale, Arizona "Diversity Office," the Ninth Circuit squarely rejected an argument that a "municipal government entity engaged in classic governmental functions" could not have the requisite interstate commerce nexus.  The Court explained that a nexus to interstate commerce required something more than "a passive, passing, or past connection to commerce," such as is often the case with crimes against private residences or ordinary persons.  See 804 F.3d 946, 950 (9th Cir. 2015) (quoting Jones, 529 U.S. at 855).  The Court explained that, even where an entity may not be shown to be "inherently" a commercial enterprise, it satisfies the nexus if it "actively engages in" or its "activity affects" interstate commerce.  Id. at 951.  Ultimately, the panel identified several facts that indicated that relevant city offices engaged in or affected interstate commerce, including that it (1) partnered with national organizations for events; (2) actively participated in organizations located outside the state; (3) contracted with "keynote speakers" from outside the state; (4) advertised; and (5) solicited and approved vendors for food and entertainment.

Id. at 954.  The NYPD does virtually all of the same types of active interstate conduct—they partner with interstate agencies like the JTTF, contract people from outside the state to consult, advertise nationally, and hire vendors for various tasks—in addition to having a physical presence around the United States and the world.

Given such facts, even apart from the precedent described above that holds that an impact on municipalities and local police is sufficient to affect commerce, a general Commerce Clause analysis compels denial of the defendant's motion.

II.      The Defendant's Challenge to Count Three Is Precluded by *Scarborough v. United States*

A.      Applicable Law

In Scarborough v. United States, 431 U.S. 563 (1977), the Supreme Court—construing a statutory predecessor of 18 U.S.C. § 922(g)(1)—concluded that the prosecution could carry its burden of showing the requisite interstate commerce element by proving beyond a reasonable doubt that the firearm previously had traveled in interstate commerce.  Id. at 575.  In so holding, Scarborough interpreted Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197, 236–37 (1968), which made it illegal, among other things, for a felon to "receive, possess, or transport in commerce or affecting commerce…any firearm."  Scarborough, 431 U.S. at 564 (quoting Title VII) (internal quotations omitted).

The Second Circuit has repeatedly invoked the holding in Scarborough to hold that under § 922(g)(1), "proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce."  United States v. Sorrentino, 72 F.3d 294, 296 (2d Cir. 1995) (quoting Scarborough 431 U.S. at 564) (internal quotations omitted); see also United States v. Garcia, 94 F.3d 57, 65 (2d Cir. 1996) ("it is sufficient to sustain a conviction under § 922(g) that

23

the government prove beyond a reasonable doubt that the firearm previously had traveled in interstate commerce.").

B.    Argument

The defendant acknowledges that Scarborough and Second Circuit precedent preclude him from challenging Count One, charging Hobbs Act robbery, and Count Four, charging a violation of 18 U.S.C. § 922(g)(5).  ECF Docket No. 18, p. 21-23 ("the court is bound by precedent as to the constitutionality of § 922 and the Hobbs Act, until and unless the Supreme Court expressly overrules Scarborough.").  Yet the defendant asks the Court to ignore this authority when considering Count Three, charging a violation of 18 U.S.C. § 924(l), theft of a firearm that has moved in interstate commerce.  The defendant urges this Court to break with decisions in this and a variety of other Circuits that have applied Scarborough when resolving Commerce Clause issues related to a variety of criminal statutes.  See, e.g., United States v. Patton, 451 F.3d 615, 634-36 (10th Cir. 2006) (acknowledging considerable tension between Scarborough and Lopez, but deciding the court was "bound" by Scarborough in interpreting statute prohibiting possession of body armor with identical commerce element).  Instead, the defendant asks the Court to expand the scope of Lopez.

The defendant's reliance on Lopez is misplaced.  Unlike the statute at issue in Lopez, Section 924(l) contains an express, specific jurisdictional element that addresses whether the firearm in question affects interstate commerce.  See United States v. Smith, 101 F.3d 202, 215 (1st Cir. 1996) (rejecting Lopez where the statutory language "ensures, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. Where, as here, the jurisdictional element is present, the government need only prove the minimal nexus to interstate commerce identified in Scarborough.").  Specifically, the elements of Count Three include: 1) the defendant stole a firearm; 2) the firearm was "moving as, or is a part of, or which has moved in

24

interstate or foreign commerce"; and 3) the defendant acted knowingly.  18 U.S.C. § 924(l).  As such, the statutory language speaks directly to the issue, and no further interpretation is required. By suggesting otherwise, the defendant asks this Court to flout precedent and ignore the plain language of the statute.  The Court should reject the defendant's invitation and deny his motion as to Count Three.

III.    Hobbs Act Robbery Is Categorically a Crime of Violence for Purposes of 18 U.S.C. § 924(c)

A.    Applicable Law

In United States v. Hill, 890 F.3d 51, 53 (2d Cir. 2018), the Second Circuit held that that substantive Hobbs Act robbery is a crime of violence under the elements clause of Section 924(c)(3)(A), which prohibits the use of a firearm in furtherance of federal crime of violence.   More recently, in United States v. McCoy, 995 F. 3d 52 (2d Cir. 2021), the Second Circuit held that an attempt to commit Hobbs Act robbery necessarily involved the attempted use of force, and therefore, under the categorical approach, Hobbs Act attempted robbery was also crime of violence under 18 U.S.C. § 924(c).  Id at 56-7.

B.    Argument

The Second Circuit decisions in Hill and McCoy have definitively resolved that Hobbs Act robbery and attempted Hobbs Act robbery qualify as crimes of violence under 18 U.S.C. §924(c).  While the defendant "avers that Hill is wrongly decided," he provides no basis or caselaw in support of this conclusion.  ECF Docket No. 18, p. 25.  His challenge to Count Two is therefore unavailing and should be denied.

25

IV.    Count Two Is Not Duplicitous

A.    Applicable Law

An indictment is "impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (quoting United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)). Courts have described the policy considerations underlying avoiding a duplicitous indictment to include: a general guilty verdict will not reveal if the jury found the defendant guilty of only one crime and not the other, or guilty of both; a guilty verdict does not indicate whether the jury found the defendant guilty without having reached a unanimous verdict on the commission of a particular offense; inadequate notice to the defendant of the charges against him; interference with appropriate sentencing; and protecting the defendant against double jeopardy in a subsequent prosecution. See Murray, 618 F.2d at 896.

A count is not duplicitous if it charges a single crime committed by more than one means. See Fed. R. Crim. P. 7(c) ("[i]t may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means."). It is well-settled that while criminal statutes are drafted in the disjunctive, violations of those statutes may be pleaded in the conjunctive. See Turner v. United States, 396 U.S. 398, 420 (1970).

In United States v. Combs, 369 F.3d 925 (6th Cir. 2004), the Sixth Circuit concluded that § 924(c) criminalizes two separate and distinct offenses—(1) possession of a firearm in furtherance of a crime, and (2) use and carrying of a firearm during and in relation to a crime. The Second Circuit, however, "has never decided whether the statute is duplicitous, and at least one other circuit – the Seventh Circuit – has reached the conclusion that it is not." Harris vs.

26

United States, No. 09-CV-4380 (ARR), 2010 WL 2710600, at *2 (E.D.N.Y. July 6, 2010) (citing United States v. Haynes, 582 F.3d 686, 704 (7th Cir. 2009)).  In following the Seventh Circuit approach, the district court in Harris noted that "the three ways in which [the crime defined in] § 924(c) can be committed may be alleged in the conjunctive in one count…and proof of any one of them will support [a] conviction."  Id.  See also United States v. Stewart, No. 08 CR 720, 2009 WL 2149603, at *2 (N.D.Ill. July 17, 2009) ("Because § 924(c) sets forth disjunctive theories of liability for a single offense, an indictment is not duplicitous if it raises the theories conjunctively in a single count.").

In clarifying the import of Combs, the Sixth Circuit has taken care to distinguish a duplicitous indictment under § 924(c) that does not call into question "'the unanimity of a verdict of guilty…because proper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense.'"  United States v. Lloyd, 462 F.3d 510, 514 (6th Cir. 2006) (quoting United States v. Savoires, 430 F.3d 376, 380 (6th Cir. 2005)).

The remedy for a duplicitous indictment before trial is reformulation rather than dismissal.  See United States v. Barrett, No. 10-CR-809 (KAM), 2011 WL 6780901, at *2-5 (E.D.N.Y. Nov. 27, 2011) (explaining that duplicitous pleading "is not presumptively invalid," does not "necessarily require dismissal" and that "courts can employ alternatives less drastic than dismissal").  The government may elect to proceed on one of the charged crimes, or the court may remove the potential prejudice through a curative jury instruction.  See United States v. Helmsley, 941 F.2d 71, 91 (2d Cir. 1991) ("any possibility of a duplicitous verdict was removed by [the court's] careful charge"); United States v. Droms, 566 F.2d 361, 363 n.1 (2d Cir. 1977).  After trial, "a court can avoid prejudice to the defendant by sentencing him based upon a conviction for

27

only one offense…as long as that one offense does not carry a higher penalty than the other." Sturdivant, 244 F.3d at 80.

B.      Argument

The defendant urges this Court to adopt his view of the Sixth Circuit holding in Combs and find that Count Two, charging a violation of § 924(c), criminalizes two separate and distinct offenses and is therefore duplicitous.   Even assuming the defendant's interpretation of Combs is correct, as noted above, the Seventh Circuit has held that § 924(c) is not duplicitous and the Second Circuit has not ruled on the issue.  See Haynes, 582 F.3d at 704; Harris, 2010 WL 2710600, at *2.   As noted in Haynes, a violation of § 924(c) can be committed in "three ways…alleged in the conjunctive and proof of any one of them will support [a] conviction." Haynes, 582 F.3d at 704.   As such, Judge Ross noted in Harris that properly-crafted jury instructions can eliminate any duplicity concern.  See Harris, 2010 WL 2710600, at *2 ("[I]n the instant case, as the government observes and Harris does not dispute, the jury instructions not only clearly specified the elements of the three potential ways to commit the § 924(c) offense but also explicitly required that the jury be unanimous as to one of the three ways.   There can thus be no doubt that the jury reached a unanimous verdict with respect to conduct that constitutes a codified federal offense under the statute.").

Even the Sixth Circuit has interpreted Combs in this way.  "[T]he Sixth Circuit has taken care to distinguish a duplicitous indictment under § 924(c) that does not call into question "'the unanimity of a verdict of guilty . . . because proper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense.'"  Harris, 2010 WL 2710600, at *2 (quoting Lloyd, 462 F.3d at 514 and Savoires, 430 F.3d at 380).

28

This view comports with the Second Circuit's approach to other criminal statutes, which are typically drafted in the disjunctive, but pleaded in the conjunctive. See Turner, 396 U.S. at 420. For example, the Second Circuit has expressly held that it is not duplicitous for an indictment to charge a defendant in one count under both subsections (1) and (2) of 18 U.S.C. § 1344, the bank fraud statute. See United States v. Crisci, 273 F.3d 235, 239 (2d Cir. 2001) (finding that indictment charging bank fraud under both subsections of Section 1344 not duplicitous because they merely define different methods of defrauding a bank). Likewise, the Second Circuit held it is not duplicitous for an indictment to charge a defendant in one count under both subsections (1) and (2) of 18 U.S.C. § 1001. See United States v. Stewart, 433 F.3d 273, 280, 319 (2d Cir. 2006) (rejecting duplicity argument regarding indictment count charging a defendant with making false statements in violation of Sections 1001(a)(1) and (2)). See also United States v. Pugh, No. 15-CR-116 (NGG), 2015 WL 9450598, at *17 (E.D.N.Y. Dec. 21, 2015) (applying duplicity analysis to 18 U.S.C. § 1512(c) and noting that "charging both Section 1512(c)(1) and Section 1512(c)(2) in the same count is not duplicitous.").

There is no reason to alter this settled approach when considering Section 924(c). Even if the Court were to conclude the indictment was improperly pled, the defendant can show no prejudice at this juncture that would warrant the drastic step of dismissal when a myriad of other remedies are available before, during and after trial. See, e.g., Barrett, 2011 WL 6780901, at *2-5 (E.D.N.Y. 2011) (duplicitous indictment may be cured prior to trial by reformulation); Helmsley, 941 F.2d at 91 ("careful" jury charge removed "any possibility" of a duplicitous verdict); Sturdivant, 244 F.3d at 80 (a court "can avoid prejudice…by sentencing him based upon a conviction for only one offense…as long as that one offense does not carry a higher penalty than

the other."). These steps would address the primary policy considerations regarding duplicitous indictments by avoiding a general guilty verdict and requiring unanimity.

Accordingly, the defendant's motion to dismiss Count Two as duplicitous should be denied.

### THE GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS

The defendant seeks the suppression of items recovered from the Apartment, claiming that "the purported consent to search was not voluntary, was the product of duress and coercion, and was tainted by the illegal seizure of the Camovic home and its occupants for more than sixteen hours." ECF Docket No. 18, p. 5. As discussed below, none of these contentions are supported by the facts or the law, and the conduct of law enforcement was reasonable and comported with the Fourth Amendment. Specifically, the warrantless entry into the apartment was reasonable and justified both on consent and the exigent circumstances that existed in the immediate aftermath of a terrorist attack. Second, law enforcement's extended presence in the Apartment, as well as any other interference with the occupants' possessory interests in their residence, was similarly reasonable and no more extensive or intrusive than necessary. Finally, Husejin Camovic's consent to search the apartment and seize particular items was voluntary and not procured through coercion or other unconstitutional means. In any event, the inevitable discovery exception to the exclusionary rule would permit the admission of the seized evidence.

I.    Law Enforcement's Entry into the Apartment Was Lawful

A.    Applicable Law

1.    Consent

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. CONST. amend. IV. The entry of a person's home without a warrant supported by probable cause is per se unreasonable, with only a few specific exceptions. Payton v. New York,

445 U.S. 573, 576 (1980); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  One exception

to the warrant requirement is valid third-party consent.[13]  Schneckloth, 412 U.S. at 245-46; United

States v. McGee, 564 F.3d 136, 138-39 (2d Cir. 2009) (quoting United States v. Matlock, 415 U.S.

164, 171 (1974) ("A warrantless police search of a defendant's private premises which would

otherwise violate the defendant's rights under the Fourth Amendment is lawful if conducted

pursuant to the consent, voluntarily given, of another person who has authority to consent by

reason of that person's 'common authority over or other sufficient relationship to the premises.'").

Even without a warrant or probable cause, police "may approach a home and knock" and request

permission to speak or enter "because that is no more than any citizen might do."  Florida v.

Jardines, 569 U.S. 1, 8 (2013) (quotations and citations omitted).

When "the government relies on consent to justify a warrantless search, it bears the

burden of proving by a preponderance of the evidence that the consent was voluntary."  United

States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006).  Whether consent was voluntary or, instead, the

product of duress or express or implied coercion "is a question of fact to be determined from the

totality of all the circumstances."  Payton, 445 U.S. at 227.  Whether the person who gave consent

knew of her right to refuse consent "is not a requirement to a finding of voluntariness, although it

may be a factor in ascertaining whether the consent was coerced."  United States v. Garcia, 56

F.3d 418, 422-23 (2d Cir. 1995).  Other relevant considerations include "the age, education,

---

[13]        Though not contested by the defendant, the government notes that Husejin Camovic had authority to consent to entry and search of the Apartment.  Generally, consent to search rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."  Matlock, 415 U.S. at 164, 171 n.7; see also Fernandez v. California, 571 U.S. 292, 300, 303 (2014) ("consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search," and holding that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason."); Moore v. Andreno, 505 F.3d 203, 208-09 (2d Cir. 2007) ("a third party has authority to consent to a search of a home when that person (1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area.").

intelligence, and English language proficiency of the person giving consent, the length of any detention, [and] the use of physical punishments or deprivations…" United States v. Lopez, 97-CR-483 (RPP), 1997 WL 790582, at *6 (S.D.N.Y. Dec. 24, 1997) (citations omitted).  The Fourth Amendment is satisfied when an officer's belief that consent authorized an entry was, under the circumstances, objectively reasonable.  United States v. O'Brien, 926 F.3d 57, 76-77 (2d Cir. 2019) (citing Florida v. Jimeno, 500 U.S. 248, 249-251 (1991)).

While a misrepresentation that law enforcement could or would obtain a search warrant may vitiate consent, law enforcement may "represent accurately their intent [and] ability to obtain a search warrant."  United States v. Munoz, 987 F. Supp. 2d 438, 447 (S.D.N.Y. 2013) ("Where the police have an honest basis for their statement [to obtain a warrant], it is not coercive to make it . . . But false threats made in order to obtain consent deprive the suspect of a free and informed choice based on the realities before him.") (footnote omitted).

Consent need not be express and may be implied by "an individual's words, acts, or conduct."  United States v. Deutsche, 987 F.2d 878, 883 (2d Cir. 1993); Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988); United States v. Grant, 375 F. App'x 79, 80 (2d Cir. 2010) (summary order) (officers had a reasonable basis to believe that consent justified entry into an apartment where a man admitted officers into his building and did not object as the officers followed him down the hall and into his apartment.); Seifert v. Rivera, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) (holding that although a woman may have stepped back from her door to restrain a dog from running outside, "it was objectively reasonable for the [d]etectives to believe that [she] had consented to their entry when she stepped backwards from the open door").  At the same time, however, mere submission to a show of authority is not voluntary consent.  See Kaupp v. Texas, 538 U.S. 626, 632 (2003) (per curiam).  As such, courts may find that consent was not voluntarily

32

given where officers issued commands, rather than making requests. See, e.g., id. at 631 (holding that the defendant's response of "okay" did not establish consent where officers had "rous[ed] [the defendant] out of bed in the middle of the night with the words 'we need to go talk'").

### 2.    Exigent Circumstances

Warrantless entries, searches, and seizures do not violate the Fourth Amendment when there is probable cause and the exigencies of the situation make the needs of law enforcement so compelling that the warrantless conduct is objectively reasonable. Kentucky v. King, 563 U.S. 452, 460 (2011); Dalessandro v. County of Nassau, 758 F. App'x 165, 167 (2d Cir. 2019) (summary order) ("Warrantless entry is justified when there is both probable cause and exigency" (citing Kirk v. Louisiana, 536 U.S. 635, 638 (2002) (per curium)). In such circumstances, "a warrantless search is potentially reasonable because there is compelling need for official action and no time to secure a warrant." Missouri v. McNeely, 569 U.S. 141, 149 (2013) (citation and quotation omitted). To determine whether such an exigency existed, the Court must ask whether, in light of all the circumstances, "it was objectively reasonable for the law enforcement officers to believe there was an urgent need for th[eir] warrantless conduct." United States v. Delva, 858 F.3d 135, 152 (2d Cir. 2017). The Second Circuit has identified several factors that aid in determining whether exigent circumstances exist, including: (1) the gravity or violent nature of the offense; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; (6) the peaceful circumstances of the entry; and (7) whether quick action is necessary to prevent the destruction of evidence. See United States v. Moreno, 701 F.3d 64, 73 (2d Cir. 2012) (affirming finding of exigency). Because "these factors are not germane in every exigent circumstances situation," they are considered illustrative rather than exhaustive, and "the presence

33

or absence of any one factor is not conclusive." Id. (citations and quotations omitted). "A district court's determination as to whether exigent circumstances existed is fact-specific, and will not be reversed unless clearly erroneous." United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990) (en banc).

B.   Argument

1.   Husejin Camovic Provided Consent To Enter the Apartment

The law enforcement officers' warrantless entry into the Apartment was predicated on Husejin Camovic's voluntary and authorized consent. One of the responding officers rang the buzzer for the Apartment, identified themselves as police and asked to come inside. Husejin Camovic then buzzed the officers into the building. Once, inside, one of the officers knocked on the Apartment door, again identified themselves as police officers to Husejin Camovic, advised that there had been an incident involving his son, and asked to speak with him inside the apartment. Husejin Camovic then opened the door and allowed the officers to enter the Apartment.

As such, no Fourth Amendment violation occurred. It is settled law that a warrantless entry into a defendant's private premises "is lawful if conducted pursuant to the consent, voluntarily given, of another person who has authority to consent by reason of that person's 'common authority over or other sufficient relationship to the premises.'" Matlock, 415 U.S. at 171. This is true irrespective of whether the officers had probable cause. Jardines, 569 U.S. at 8. Certainly, Husejin Camovic was competent to consent – he is 49 years old, a long-time U.S. resident who is gainfully employed, fluent in English and the Apartment's tenant of record. See Schneckloth, 412 U.S. at 226; United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (factors to be considered in determining whether consent was voluntary include the age, education, intelligence and English language proficiency of the person giving consent). Nor did the officers expressly or implicitly threaten or pressure Husejin Camovic in any way. See Lopez, 1997 WL

34

790582, at *6 ("other relevant factors include whether guns were drawn or whether the consenting adult was threatened") (internal quotations omitted). "[T]he Constitution does not prohibit police officers from knocking on a door in hopes of obtaining consent to enter." United States v. Hernandez, 19-CR-097 (VM), 2020 WL 3257937 at *13 (S.D.N.Y. June 16, 2020) (citing King, 563 U.S. at 466-67). Indeed, officers "may have a very good reason to announce their presence loudly and to knock at the door with some force." King, 563 U.S. at 468. The officers announced their presence, requested to enter, and received permission to do so.

Moreover, at the time of his initial consent, given immediately upon meeting the officers, Husejin Camovic had not been detained and was not subjected to restraint or imposition of any kind. Indeed, Husejin Camovic concedes that he consensually allowed the officers access to both the building and the Apartment. See ECF Docket No. 19-3, p. 2 ("[t]hey told me they were police and they asked if they could come inside the lobby. I let them in."). Any subjective beliefs that factored into Husejin Camovic's decision making are largely irrelevant, as courts in this Circuit have concluded. See Grant, 375 F. App'x at 80; Seifert, 933 F. Supp. 2d at 316.

Additionally, the lack of information the officers provided about the defendant's situation or condition was proper given the circumstances. Indeed, it would have been lawful for the officers to use trickery or deception in order to gain entry, so long as doing so did not negate the voluntariness of the subsequent consent. Lewis v. United States, 385 U.S. 206, 210 (1966); United States v. Alejandro, 368 F.3d 130, 135 (2d Cir. 2004) (use of trickery or deception in gaining entry into a dwelling does not by itself necessarily violate a defendant's Fourth Amendment rights). For example, in United States v. Pollaro, 733 F. Supp. 2d 364 (E.D.N.Y. 2010), the district court found that, even if the defendant's wife was led to believe that there was an issue of national security at hand when agents identified themselves as agents of the Department

35

of Homeland Security, such circumstances did not rise to the level of the "extreme deception" required to render invalid consent to the agents' entry into her home and search of the home's computers. Id. at 368-9. The court noted that "the agents made no statements confirming or denying [the defendant's wife's] presumption" that there was an issue of national security at hand, and she never mentioned her assumption about national security, "giving the agents no reason to know of (or correct) her erroneous belief." Id. at 368. Thus, even accepting Husejin Camovic's affidavit as true – that he let the police enter because he felt it was the only way to obtain information about the defendant – it is of no moment. See ECF Docket No. 19-3, p. 2 ("I let them in [the Apartment] because I was worried that something had happened with [the defendant] and the only way they would tell [him] what happened is if I let them inside."). Certainly, the responding officers had an objectively reasonable belief that Husejin Camovic had consented to their entry. O'Brien, 926 F.3d at 76-77.

Thus, under these circumstances, allowing the officers to enter the Apartment was "a product of [Husejin Camovic's] "free and unconstrained choice," United States v. Arango–Correa, 851 F.2d 54, 57 (2d Cir. 1988), rather than a mere acquiescence from a "show of authority" or duress, United States v. Vasquez, 638 F.2d 507, 524 (2d Cir. 1980). See, e.g., United States v. Mendoza, 677 F.3d 822, 829 (8th Cir. 2012) (affirming district court's holding that consent was valid because, although significant police presence at the roadside stop raised the possibility that defendant merely acquiesced to police authority, that fact alone did not outweigh other factors that proved voluntariness under a totality of circumstances).

2.    Exigent Circumstances Warranted a Warrantless Entry into the Apartment

In addition to the valid consent provided by Husejin Camovic, exigent circumstances also permitted the officers warrantless entry into the Apartment. Applying the factors articulated by the Second Circuit, "it was objectively reasonable for the law enforcement

36

officers to believe there was an urgent need for th[eir] warrantless conduct." Delva, 858 F.3d at 152. Specifically, the defendant had just conducted a terrorist attack on law enforcement, stabbing and shooting several officers and gravely wounding one of them. ISIS and al-Qaeda have both directed its supporters to engage in coordinated terrorist attacks, involving multiple actors and multiple targets. Shortly after the defendant's attack, it was unknown whether other perpetrators or accomplices were involved and still at large. It was also unknown whether other attacks were imminent, such as had occurred with the November 2015 terrorist attacks in Paris, which involved multiple coordinated attacks by ISIS supporters.

Given that an electronic device was recovered from the defendant incident to his arrest, there was probable cause to believe that additional electronic evidence – which is easily deleted, secreted or destroyed – was present in the defendant's home. See United States v. Dzionara-Norsen, 19 CR 6131G, 2020 WL 1897179, at *10 (W.D.N.Y. Apr. 17, 2020) (collecting cases and noting that digital evidence has been widely recognized to be readily destructible.). Supporters of foreign terrorist organizations responsible for terrorist attacks in the United States have also been known to use multiple electronic devices in order to evade law enforcement detection of their plotting. See, e.g., Katie Brenner and Adam Goldman, "F.B.I. Finds Link Between Pensacola Gunman and Al Qaeda," New York Times, May 18, 2020 (noting that Pensacola terrorist attack perpetrator was in possession of two iPhones at the time of the attack, and that at least one contained evidence of "years of planning and preparation").[14]

Additionally, given the ensuing media coverage of the incident, it was likely that any unapprehended confederates "would escape, and a virtual certainty that the evidence would be destroyed and coconspirators notified, if the time were taken to obtain a warrant" before

---

[14]    Available at https://www.nytimes.com/2020/05/18/us/politics/justice-department-al-qaeda-florida-naval-base-shooting html (last visited Aug. 29, 2021)

37

entering the Apartment.  United States v. Lopez, 937 F.2d 716, 723 (2d Cir. 1991).  It is also important to note the backdrop to the defendant's attack, as the city was in the midst of unprecedented civil unrest.  In this context, law enforcement was entitled to enter the defendant's apartment even absent Husejin Camovic's consent.

II.       Law Enforcement Properly Secured the Apartment, Their Presence and Conduct Was Reasonable, and Husejin Camovic's Additional Consent to Search Was Valid

A.        Applicable Law

The Supreme Court has held that law enforcement may secure a residence pending issuance of a warrant in the interest of preserving evidence.  See Segura v. United States, 468 U.S. 796, 812-13 (1984); Illinois v. McArthur, 531 U.S. 326 (2001).  As the Court explained in McArthur, in determining whether such a seizure is reasonable, courts must "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable."  531 U.S. at 331.  The Court looked at four non-exhaustive factors: (1) whether there was probable cause to believe the home contained evidence of a crime; (2) whether there was "good reason to fear that, unless restrained, [an occupant] would destroy [evidence] before they could return with a warrant"; (3) whether "reasonable efforts [were made] to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether "police imposed the restraint for a limited period of time . . . no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant."  Id. at 331-33 (citations omitted).  In applying McArthur, the Second Circuit has held that "[a]s the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search…it follows that the need to prevent the destruction of evidence provides sufficient justification for the less intrusive act of securing the premises until a search warrant is obtained."  Lawson v. Hilderbrand, 642 F. App'x 34, 35-36 (2d Cir. 2016) (summary order).

38

B.        Argument

While the law enforcement presence was prolonged and undoubtedly intrusive, it was reasonable and necessary to secure the location while law enforcement attempted to apply for a search warrant.[15]  Nor did anything transpire that would vitiate Husejin Camovic's later consent to search.[16]

As a threshold matter, the mere duration of the law enforcement presence in the apartment is not presumptively unreasonable.  See Segura, 468 U.S. at 812-13 (19-hour seizure deemed reasonable given the time generally required to procure a warrant in the area at that time, noting that more than half of the delay occurred between 10 p.m. and 10 a.m., "when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests.").  Here, although law enforcement was present for a substantial amount of time, that presence was reasonable and appropriate given that the interaction began late at night, occurred during civil unrest and an ongoing pandemic, and involved an act of terrorism.

While a misrepresentation that law enforcement could or would obtain a search warrant may vitiate consent, here, "the government "represent[ed] accurately their intent [and] ability to obtain a search warrant." Munoz, 987 F. Supp. 2d at 447.  As such, law enforcement's statements to Husejin Camovic that a search warrant would be obtained was "merely truthful

---

[15]        Even if the initial entry were found to be improper, the evidence shows that the subsequent consent to search the Apartment was sufficiently attenuated from any alleged constitutional violation with law enforcement's initial entry.  See, e.g., United States v. Smith, 688 F.3d 730 (11th Cir. 2012) (police officers' conduct following initial entry into defendant's home did not interfere with defendant making knowing, intelligent, and voluntary choice to consent to search, and thus causal connection between initial entry and defendant's consent was sufficiently attenuated to dissipate taint, for purposes of determining whether to exclude evidence stemming from that search.).

[16]        Notably, the Fourth Amendment does not require government agents to obtain a warrant at the earliest possible moment.  See Lopez, 937 F.2d at 723 (law enforcement may wait "until events have 'proceeded to a point where the agents could be reasonably certain that the evidence would ultimately support a conviction"); United States v. Miles, 889 F.2d 382, 383 (2d Cir.1989) ("even if the agents might have been able to obtain a warrant earlier in the day, their failure to do so at the first opportunity does not bar them from acting on an exigency that arises later.") (citation omitted).

39

advice of the most likely sequence of events absent consent," rather than a threat "in the absence of consent despite knowing that a search warrant most likely would not issue." Id.; see also United States v. Discala, No. 14-CR-399 (ENV), 2018 WL 1187394, at *19 (E.D.N.Y. Mar. 6, 2018) (upholding written consent to search where "given the mass of evidence the investigation had already developed, the advice given to [defendant's wife] that a search warrant would be obtained was hardly hollow."). Indeed, law enforcement was in the process of obtaining a search warrant at the time Husejin Camovic gave oral and written consent to search – the option to consent to search rather than wait for a search warrant was offered at his suggestion in order to accommodate him. Far from the offer of consent being extracted through the coercive threat of a search warrant, it was only after an inquiry by Husejin Camovic.

A litany of other factors support the conclusion that Husejin Camovic voluntarily consented to the search. First, despite the police presence and atmosphere in the Apartment, neither he nor his daughter were ever in a custodial situation and were free to leave the Apartment at any time. In United States v. Wilson, for example, the district court found that the defendant's consent to police officers' search of his bedroom in apartment he shared with his sister was voluntarily given. 914 F. Supp. 2d 550, 564 (S.D.N.Y. 2012). Although the defendant was in custody, handcuffed, and sitting in the back of the police car when officer interrogated him about the location of his gun and asked for his consent to a search of his bedroom for the gun, and the officer failed to advise defendant of his Miranda rights and to provide him with a consent-to-search form, such conduct did not constitute acts of coercion sufficient to have overwhelmed defendant's ability to act voluntarily. Id.; see also Edwards v. Superintendent, Southport C.F., 991 F. Supp. 2d 348, 369 (E.D.N.Y. 2013) (defendant voluntarily consented to search of his home while he was detained at police station; officers on scene told defendant that he was entitled to decline their

40

request to search his home and that they would not proceed without oral and written consent, defendant then signed consent form, which also noted that he was entitled to decline, and provided oral consent.).

Second, as stated previously, Husejin Camovic was competent to consent. See Schneckloth 412 U.S. at 226; Wilson, 11 F.3d at 351. Nor did the officers expressly or implicitly threaten or pressure Husejin Camovic in any way. The fact that they did not provide details about the attack cannot be said to be threatening or a form of implied pressure, and, in any event, was an investigative necessity at the time given the valid concerns about possible coconspirators and follow-on attacks.

Indeed, the conduct here is similar to or substantially less deceptive and onerous than circumstances where courts in this Circuit have found voluntary consent to have been validly given. See, e.g., United States v. Cacace, 796 F.3d 176, 189 (2d Cir. 2015) (defendant's wife voluntarily consented to warrantless search of home; although agent falsely indicated she wanted to use family photographs to save agent's husband from death row; consent was not elicited by immediate threat, as even if the prosecution sought the death penalty, it would have come to pass only after lengthy and attenuated proceedings.); Moreno, 701 F.3d at 76 (defendant's consent to search of her luggage and motel room was voluntary even though armed agents had forcibly entered her room; subdued and handcuffed her; and failed to inform her of her Miranda rights or that she was not required to consent, where agents did not use intimidating or coercive language or gestures in seeking her consent; defendant did not hesitate when agents requested her consent but immediately gave them permission to search her bags; volunteering that bags had already been searched at airport; and defendant signed consent form that noted she had been asked to permit search of her luggage and room that affirmed she had not been threatened or forced in any way,

41

and that concluded by stating that she freely consented.); United States v. Schaefer, 859 F. Supp. 2d 397, 407-408 (E.D.N.Y. 2012) (circumstances surrounding defendant's consent to a warrantless search of his home were non-coercive within meaning of the Fourth Amendment where defendant was approached at his own residence during the evening; the two agents and detective who came to speak with him did not draw their weapons; the agents asked defendant for permission to enter his home, which he granted; they introduced themselves and stated that the reason for the visit related to child pornography, without giving specifics about the investigation; defendant was never handcuffed or placed in custody by the agents; and no threats or promises were made to defendant during the interview or search.).

Third, Husejin Camovic's conduct is consistent with consent.  He permitted law enforcement to enter his residence, permitted them to stay, spoke with them and let them look around the apartment.  He consented, in writing, to the seizure of a kitchen knife.  He tells an NYPD Sergeant that he can look inside the defendant's bedroom.  All of this conduct, prior to his consent to search the apartment more fully, reflects objective actions that demonstrate his final written consent was voluntary.

Fourth, while under no obligation to do so, law enforcement explicitly informed Husejin Camovic that he could refuse to consent to any search, and he was permitted to speak with and retain an attorney.  See, e.g., Schaefer, 859 F. Supp. 2d at 409 (fact that defendant, after not being allowed to make the call, signed a consent form which explicitly stated that he had the right to decline the search, demonstrated that he understood his right to refuse consent).

Finally, as discussed above, even if Husejin Camovic had subjective beliefs that made him feel compelled to acquiesce and agree to the search, this cannot invalidate his consent in light of all the other objective circumstances present.  See, e.g., Phillips v. County of Orange,

42

894 F. Supp. 2d 345, 371 (S.D.N.Y. 2012) (subjective fears of parents that their children might be questioned again or taken from them were not sufficient to vitiate otherwise valid consent); Pollaro, 733 F.Supp. 2d at 368 (subjective belief about possible national security concerns attendant to law enforcement home visit did not invalidate consent, particularly where "agents [had] no reason to know of (or correct) her erroneous belief.").

Accordingly, the totality of the circumstances show that Husejin Camovic's consents to search were voluntary – a fact that he confirmed in the consent forms he executed.

III.     Any Evidence Recovered from the Apartment Was Inevitably Discoverable

A.     Applicable Law

Inevitable discovery is an exception to the exclusionary rule that allows the admission of unlawfully seized evidence when the government can show that the evidence inevitably would have been discovered by lawful means. See Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Stokes, 733 F.3d 438, 444 (2d Cir. 2013). "For inevitable discovery to be demonstrable, it must be the case that the evidence would have been acquired lawfully through an independent source absent government misconduct…The exception requires the district court to determine viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." United States v. Cabassa, 62 F.3d 470, 474 (2d Cir. 1995) (quoting United States v. Eng, 997 F.2d 987, 990 (2d Cir. 1993) (emphasis in original)). The court must accordingly "find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006). The government must establish inevitable discovery by a preponderance of the evidence. See Cabassa, 62 F.3d at 474.

43

B.        Argument

Even assuming arguendo that the search of the Apartment was unlawful, the inevitable discovery exception to the exclusionary rule would still permit the admission of the seized evidence and the fruits of any derivative searches.

As stated previously, upon entry into the Apartment, law enforcement noted a knife in an open pantry area that matched the description of the knife the defendant used in his attack on law enforcement, and a brief look into the defendant's room – at Husejin Camovic's invitation – revealed numerous electronic devices and storage media.   Given the manifest evidentiary significance of these items, the preponderance of the evidence makes it clear that such evidence "inevitably would have been discovered by lawful means." Nix, 467 U.S. at 444; Stokes, 733 F.3d at 444; Cabassa, 62 F.3d at 474.  In other words, the plain view observations of either the knife or the electronics in the defendant's room gave law enforcement probable cause to secure a warrant to fully search the apartment and seize these items and other evidence.  As such, any alleged impropriety in securing Husejin Camovic's consent was harmless, as the evidence inside the Apartment would have been inevitably searched and seized pursuant to a search warrant.

Indeed, law enforcement had probable cause to obtain a search warrant for the Apartment based solely on evidence gleaned from the defendant's attack and completely independent of facts learned after law enforcement's entry into the Apartment. See United States v. Segura, 663 F.2d 411 (2d Cir. 1981) (independent source doctrine and inevitable discovery apply when evidence would have been discovered without tainted evidence); Nix, 467 U.S. at 444 (inevitable discovery exception to the exclusionary rule – an outgrowth of the independent source doctrine – allow evidence initially detected as the result of unlawful government conduct to be introduced nonetheless "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.").

44

Specifically, given the modus operandi of the attack, the recovery of a kitchen-style knife consistent with the type found as part of a set in a person's home, the seizure of a smartphone from the defendant's person incident to his arrest, the independent recovery of relevant text messages sent by the defendant from that device, and evidence that the defendant had used multiple electronic devices prior to the attack, law enforcement had an independent source and ample probable cause to search the Apartment. As such, any alleged impropriety in securing Husejin Camovic's consent was harmless, as the evidence inside the Apartment would have been inevitably searched and seized pursuant to a search warrant. As the Supreme Court explained in Nix, such an exception to the exclusionary rule is necessary to ensure that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." Id. at 443 (footnote omitted). Indeed, the Nix Court rejected the assertion that this equilibrium somehow changed, and required suppression, when the police acted in bad faith in illegally detecting the challenged evidence. Id.

United States v. Whitehorn, 829 F.2d 1225 (2d Cir. 1987), is also instructive. In Whitehorn, the Second Circuit upheld the denial of a motion to suppress where agents had independent probable cause to search and had begun drafting a search warrant. The court noted that a magistrate judge would likely have granted the warrant, and thus the evidence illegally seized would have otherwise been found under the warrant. Id. at 1230-32. This case is similar. Given the modus operandi of the attack, the recovery of the knife and the seizure of a smartphone from the defendant's person incident to his arrest, law enforcement had ample probable cause to seize and subsequently search both the knife and electronic devices observed in plain view inside the Apartment. See id. at 1231 ("[i]t is well settled that [t]he ultimate inquiry…is not whether the

45

underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.") (internal citations and quotations omitted).  Accordingly, the court can find "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor."  United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006).  Thus, even accepting the faulty premises of the defendant's suppression motion – that entry into the Apartment was illegal and Husejin Camovic's consent was involuntary – the inevitable discovery exception to the exclusionary rule applies.  As the Second Circuit said in Whitehorn, "so long as it is clear that such evidence would inevitably have been discovered by lawful means, suppression is inappropriate."  Whitehorn, 829 F.2d at 1231 (citing Nix, 467 U.S. at 445).

46

CONCLUSION

For the reasons set forth above, the government respectfully requests that the

Court deny the defendant's motions in their entirety.

Dated:  Brooklyn, New York
        September 15, 2021

                                        Respectfully submitted,

                                        JACQUELYN M. KASULIS
                                        United States Attorney
                                        Eastern District of New York

                        By:    _____/s/_____
                                        Craig R. Heeren
                                        Artie McConnell
                                        Josh Hafetz
                                        Assistant United States Attorneys
                                        (718) 254-7000

cc:     Clerk of Court (RPK) (via ECF)
        Defense counsel (via ECF)

47