# LAW OFFICES OF
# ROBERT G. STAHL, LLC

ROBERT G. STAHL♦
LAURA K. GASIOROWSKI•‡
ANDREW C. OLESNYCKY♦•

• Also Admitted in NY
‡ Also Admitted in LA

♦ CERTIFIED BY THE SUPREME COURT
   OF N.J. AS A CRIMINAL TRIAL ATTORNEY

WRITER'S E-MAIL:
RSTAHL@STAHLESQ.COM

July 28, 2022

**By ECF and Email**
United States District Court, Eastern District of New York
Judge Rachel P. Kovner, U.S.D.J.
Courtroom: 4E-N
225 Cadman Plaza East
Brooklyn, New York 11201

   *Re:*  *United States v. Dzenan Camovic, 20-CR-00326*

Dear Judge Kovner:

  On behalf of defendant Dzenan Camovic, we submit this abbreviated sentencing submission. On August 4, 2022, Dzenan Camovic comes before this Honorable Court for acceptance of the Rule 11(c)(1)(C) plea and sentencing that resolves his state and federal charges. The plea calls for a thirty-year (360 months) concurrent sentence, inclusive of the time already served since June 4, 2020 in state custody, as well as time in federal custody (*i.e.* 360 months less the time spent in state and federal custody).[1] As part of the negotiated plea, Camovic also surrendered certain appellate rights and any future challenge to his removal from the United States by signing a Stipulated Order of Removal. That sentence, the result of negotiation among

---

[1] *The People of New York v. Dzenan Camovic*, Indictment No. 00928-2020, is the companion case in Kings County, New York. Later in the afternoon of August 4, Camovic is scheduled to appear in Kings County for his state court sentencing.

the parties, consideration of both the aggravating and mitigating factors, and with the consent of the injured officers, constitutes a sentence that is sufficient, but not greater than necessary. It recognizes the seriousness of the defendant's offense, the need for deterrence, retribution and protection of the public, as well as the mitigating impact of Dzenan's personal history and characteristics, and his struggle with mental health.

Brief Statement of Offense

On June 3, 2020, Mr. Camovic was supposed to spend the night at his cousin Ubeid's apartment after having dinner with him and two others. It was later at night, and there was a curfew in place because of the protests and disorder of those summer months in the aftermath of George Floyd's death. The area of Brooklyn where the family lives and works is dangerous enough at night under any circumstances and Dzenan routinely carried a knife with him for protection. Ubeid was supposed to meet Dzenan in front of one of the apartments his father managed, but he was late, infuriating Dzenan who waited briefly, and then left. Dzenan Camovic who had walked past Officers Randy Ramnarine and Yayon-Frantz Jean-Pierre, came back to the street corner where the officers were posted and attacked them. He stabbed Officer Jean-Pierre in side of his neck with the broken kitchen knife he had with him, and in the ensuing struggle, wrested the officer's service firearm from his person and fired at him and his partner. When multiple officers responded to the scene, Mr. Camovic fired multiple times in their direction before he was shot in his neck, face, chest, left arms, left leg, and groin.[2] In addition to the

---

[2] These very serious injuries led to multiple surgeries over the course of many months, the removal of a testicle and the fusion of vertebrae in his neck to stabilize it. The latter injury was the most serious. As disclosed in the medical records, Mr. Camovic was diagnosed with a C-1 anterior tubercle fracture and type 2 dens fracture, which is a break at the base of the dens, the second vertebrae of the neck. Mr. Camovic was required to wear a cervical collar and reside in the medical unit at Rikers, as further trauma, even minor, risked catastrophic spinal injury resulting in quadriplegia or death. Mr. Camovic underwent a neurosurgical procedure to repair the above noted C1 anterior tubercle and type 2 base of dens/odontoid fractures on February 25, 2021, at Bellevue Hospital by Dr. Steven Russell, MD. The procedure

2

injuries suffered by Officer Jean-Pierre, Officer Ramnarine and Officer Nelson Tam were each shot in the hand, resulting in permanent injuries.

Mr. Camovic's attack on the officers was unprovoked. It was also a shock to Mr. Camovic's family, friends and community. Dzenan who had attended college briefly, and at one time wanted to be a police officer himself, was a hard-working son of a building superintendent, with no prior criminal history, and no known history of radical views. He had been living in the United States for more than 15 years, an immigrant son of refugee parents who came to the United States for its freedoms.[3] He had younger siblings, friends, and a place alongside his father and uncle, working on apartment buildings and the renovation an old house his father had bought in upstate New York on weekends. There was seemingly no rational explanation for his decision that night, and so both the Government and his family sought one.

The Government's explanation is that Mr. Camovic was motivated by his religious beliefs, and that his attack on the officers was a terrorist attack or terrorist inspired. In support, the Government cites the fact of his Muslim religion, the presence of religious lectures associated with radical clerics such as Anwar Al-Alwaki in the family home, his utterance of "Allahu Akbar" during the assault, his alleged statement to a nurse while under the influence and

---

was "Arthrodesis posterior atlas-axis C1-C2, and it involved fusion with instrumentation of spine posterior Cervical C1-2."

[3] Dzenan's father Husejin was from Bosnia, and his mother, Sabina, from Kosovo, during the period of upheaval in that region of the world. They had met in Bosnia when she visited family, and fell in love. Husejin was inducted in the Bosnian army and spent three years in Sarajevo during the infamous Siege of Sarajevo, the longest and one of the most brutal sieges of a capital city in modern warfare that later resulted in prosecutions of Serbian officials for crimes against humanity by the International Criminal Tribunal for former Yugoslavia. Husejin and Sabina later met in Germany as refugees, where Dzenan, Dzennana and Dzenita were born.

3

experiencing side effects of Seroquel[4], and evidence found on Mr. Camovic's phone indicating that he had browsed websites associated with ISIL, namely Dabiq and Al Hayat Media. As part of his plea, Dzenan has accepted full responsibility for his actions that evening and has stipulated to the terrorism enhancement under U.S.S.G. Section 3A1.4.  Although Mr. Camovic's crimes are not federal crimes of terrorism as defined by the statute, his crimes fall under the "promotion" prong of Section 3A1.4. [5]

His family believes that Mr. Camovic's motivation for his inexplicable attack on the police officers was caused by despair and longstanding but unaddressed mental health issues, which only intensified during COVID. As the law makes clear, a defendant's motivation is not the central issue for purposes of applying the terrorism enhancement. Thus, Mr. Camovic's mental health issues and the role his untreated depression played in his violent conduct that night is properly part of the consideration of the Court's sentencing determination under 18 U.S.C. Section 3553, and the defendant's personal history and circumstances. It in no way excuses his conduct, but explains, in part, how this young man's past was inextricably intertwined with his crime.

### Defendant's Background

As related in the PSR, Mr. Camovic was born in Germany, where his parents had reunited as refugees. Husejin had fled from Bosnia, after three years fighting in Sarajevo during

---

[4] The attached medical records from Kings County Hospital demonstrate that Camovic was prescribed Seroquel and was experiencing delirium and reported seeing things while asleep around the time of the alleged statement. (Exhibit A).

[5] The ordinary meaning of the "intended to promote" prong gives that clause a separate meaning from the "involved" prong of § 3A1.4. The "intended to promote" prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism. *United States v. Awan*, 607 F.3d 306, 314 (2d Cir. 2010)

the infamous Siege of Sarajevo. Husejin married his wife Sabina in Kosovo, and Dzenan, and two sisters, Dzenana and Dzenita, were born in Germany. Rather than offering a path to citizenship to Bosnian refugees, Germany encouraged voluntary deportation, on the threat of future mandatory deportation. Husejin could not return to Bosnia, or contemplate a future for his children there given what he had endured during the war, and Sabina who was from Kosovo and not a Bosnian citizen, would not have been permitted to return with him. The family instead left for the United States, where their Muslim identity would not subject them to persecution. The family settled in Brooklyn, and the three youngest children were born here - ███████████ ███████.

      Life in the Camovic household was difficult. (Exhibit B, Letter of Dzenita Camovic). The family was constantly worried about being deported as they sought to adjust their status. Deportation would necessarily result in the family being separated, as only Husejin was an acknowledged citizen of Bosnia. They avoided participating in programs or traveling to minimize interactions with law enforcement. The family constantly struggled financially as well. Husejin worked multiple jobs in construction and as a building superintendent. Sabina tried to take jobs cooking for people, or doing child care, but struggled to adapt to life in the United States. As they grew older, Dzenan and his siblings realized that the reason their mother was often so absent from their lives, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████.

5

Husejin was similarly unavailable to his children. He loved them, but continued to live as he had as a soldier. He had strict rules to which all the children had to adhere. The children knew that their parents loved them, but it was not something that was expressed with shows of affection or emotion.

Dzenita realized how much her parents' unaddressed trauma from their experiences during the war and as refugees affected her siblings. (Id.) Dzenan in particular had a difficult time at school and at home. He was bullied mercilessly, and when he came home bloodied after a particularly bad beating, his father instructed him that he was not to come home again beaten up. Dzenan was expected to solve his problems with his fists, but he was by nature a quiet, geeky boy who loved computer games and books.

In middle school, his parents were called in to discuss what his teacher perceived as his need for a psychological evaluation. He began to act out in school, and was suspended several times. His parents resisted the implication that their son need psychological help, in part because of their culture and their belief that faith was the cure for Dzenan's unhappiness. (Id.).

Their experiences during this period, and the subsequent hardship of living as refugees, shaped the Camovic family and influenced how the children were raised. All the children were impacted by their parent's emotional issues, by the stress and anxiety around their undocumented status, and by the family's continuing financial struggles. Dzenan still convinced himself that he could have a future here, and aspire to something more than living in the shadows. Despite his inability to secure student loans and the lack of any documentation or citizenship, Dzenan was determined to attend college in an effort to establish a more fulfilling life here. He worked to save money for college, enrolling at City Tech to study construction management. Eventually, however, Dzenan dropped out. The financial burden of college and the time commitment was

6

impacting his ability to contribute to the family's finances. (Id.) Discouraged and disheartened, Dzenan fell into a deep depression, feeling as if he had no "identity" and no future. He was stateless, with no citizenship status in any country, he couldn't have a driver's license, bank account or passport. He despaired that he would never have any future, here or anywhere else. Once again, the family noticed the change in his personality, and the clear signs of depression, but never sought counseling.

In his family's view, on the night of June 3, Mr. Camovic's depression and self-loathing reached a boiling point. His actions were those of a desperate, disordered mind. The violent encounter with police was one in which he hoped to find release, in dying. The hospital records document his mental state. He was suffering from hallucinations and delirium, necessitating a psychiatric consultation and prescription of antipsychotic medication. Following his recovery from multiple surgeries for his gunshot wounds, he was later prescribed antidepressants which he continued to receive following his transfer to BOP. In the aftermath of the shooting, the Camovic family has struggled with the terrible actions of their son that night and the thought that had he sought psychiatric help, it might have been avoided. As his sister Dzenita has related, both the family and the larger Muslim immigrant community they belong to have begun to recognize the need to better understand mental health problems that plague many in the community, and to embrace the role of medical professionals in addressing what faith cannot heal. (Exhibit B). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Dzenan Camovic's undiagnosed and untreated mental health issues are <u>not</u> an excuse for his crimes. They do help put into context other factors that were at play and may have

7

contributed to his terrible actions that night, something that might otherwise be lost in the stipulation that his crime was related to, or one that inspires terrorism, based on violent ideology that he was exposed to in the previously mentioned videos.

## Conclusion

There is no question that Dzenan Camovic committed very serious crimes, and that the punishment reflects the seriousness of his offenses. Based this incident, he was charged both in the federal and state systems. The U.S. Attorney for E.D.N.Y. and the District Attorney for Kings County, after carefully reviewing the evidence and surrounding circumstances, and after consultation with the injured officers, have agreed to concurrent 30 year sentences with credit for time served in both jurisdictions. We respectfully urge the Court to accept the plea and sentencing recommendations as agreed to by the parties as a sentence that is sufficient but not greater than necessary, to achieve the purposes of the Sentencing Act. Dzenan has and continues to accept full responsibility for his actions that night, and will live with the very substantial consequences, including spending decades in prison.

Respectfully submitted,

/s/ Robert G. Stahl
/s/ Laura K. Gasiorowski
_____
ROBERT G. STAHL, ESQ.
LAURA K. GASIOROWSKI, ESQ.
Attorneys for the Defendant Dzenan Camovic

DATED: July 28, 2022

cc: AUSAs Hafetz, McConnell & Heeren (via ecf and email)