

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JAM/JGH
F.#2020R00515

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 1, 2022

<u>By ECF</u>

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Dzenan Camovic</u>
            <u>Docket No. 20-CR-326 (RPK)</u>

Dear Judge Kovner:

      The government respectfully submits this letter regarding the sentencing of defendant Dzenan Camovic ("Camovic" or "the defendant") scheduled for 10:30 a.m. on August 4, 2022. On March 15, 2022, the defendant pleaded guilty before this Court, pursuant to a plea agreement with the government under Federal Rule of Criminal Procedure 11(c)(1)(C) ("Rule 11(c)(1)(C)"), to one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, and one count of discharging a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c). For the reasons discussed herein, the government submits that an agreed-upon sentence of 360 months' imprisonment and supervised release term of five years, as recommended by the parties, is appropriate because (1) it is within the applicable range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") and (2) is otherwise justified by the nature and circumstances of the offense.[1] <u>See</u> U.S.S.G. § 6B1.2.

I.      <u>Background</u>

      A.      <u>The Defendant's Attack on and Robbery of the Police</u>

      As detailed in the Probation Department's ("Probation") Presentence Investigation Report ("PSR") and PSR Addenda, as well as public filings in this case, on June 3, 2020, the

---

[1]     As explained further below, the plea agreement contemplates a sentence of 360 months' imprisonment less the defendant's time served since the offense, which is 26 months, and that the federal sentence run concurrent to any subsequent state sentence.

defendant committed an unprovoked attack on, and robbery of, New York City Police officers near the defendant's residence in Brooklyn, New York. Specifically, on the night of June 3, 2020, while New York City was under a curfew arising from widespread protests and social unrest, and while the City was suffering from the devastating effects of the COVID-19 pandemic, Camovic attacked several NYPD officers standing on a footpost in Brooklyn.

Security camera footage collected from various locations shows Camovic walking around the area for roughly 20 minutes before the attack in a manner consistent with deliberate surveillance and canvassing of the NYPD officers. Carrying a knife, Camovic then approached two officers from behind (having squared a City block in order to approach unseen) and immediately stabbed one of them in the neck area. Camovic began chasing the second officer, repeatedly lunging at him and eventually throwing the knife at the officer. Camovic then ran back toward the first officer, whom he had already stabbed, and attacked him again. A struggle ensued, during which Camovic fought for control of the officer's service weapon. Camovic ultimately gained control of the gun, thereby robbing the officer of his service weapon through the use of force. After gaining control of the officer's gun, Camovic fired multiple shots at several officers, including officers who responded to the scene. Responding officers ultimately shot Camovic multiple times and took him into custody. PSR ¶¶ 8-10.

Several officers were wounded as a result of Camovic's attack. Specifically, one officer (identified in the PSR as "Officer 1") was stabbed in the neck and a second officer (identified in the PSR as "Officer 2") was shot in the hand and lost a finger as a result. PSR ¶ 10. A third officer ("Officer 3") was also shot in the hand.

During his attack on the police, Camovic exclaimed "Allahu Akbar," an Arabic phrase that means "God is greatest." PSR ¶ 11. While the phrase has entirely innocuous common use in the Arabic language, it has also been shouted by perpetrators of violent jihadist terrorist attacks.[2]

While receiving treatment at a local hospital for his injuries suffered during the attack, the defendant told a nurse, in sum and substance, that he believed he had killed two police officers and that his religion had made him do it. See PSR ¶ 12.

---

[2] See, e.g., Eric Nagourney, *'Allahu Akbar': An Everyday Phrase, Tarnished by Attacks*, N.Y. Times, Nov. 2, 2017, *available at* https://www.nytimes.com/2017/11/02/world/americas/allahu-akbar-terrorism.html. Indeed, as has been widely reported in the media, September 11, 2001 hijacker Mohammed Atta instructed his fellow-hijackers to shout "Allahu Akbar" during their terrorist attacks. See, e.g., *Last Words of a Terrorist*, The Guardian, *available at* https://www.theguardian.com/world/2001/sep/30/terrorism.september113 (publishing letter found in suicide attacker Mohammad Atta's luggage instructing his fellow September 11, 2001 attackers to "Shout, 'Allahu Akbar,' because this strikes fear in the hearts of the non-believers. God said: 'Strike above the neck, and strike at all of their extremities.'").

A review of the defendant's electronic devices also revealed that, prior to the attack, Camovic downloaded and used anonymizing apps associated with the TOR network (the "dark web") shortly before the attack, see PSR ¶ 15, and also used several other communication platforms that offer the ability to engage in encrypted or otherwise undetectable means of communication. Camovic also downloaded and used a mobile application a day before the attack that allows users to receive information about local events associated with law enforcement activity. See PSR ¶ 16.

      B.      The Defendant's Possession of Jihadist Extremist Materials

As set forth in the PSR, shortly after Camovic's June 3, 2020 attack and robbery, law enforcement agents recovered evidence from the defendant and his residence, including a cell phone belonging to the defendant as well as various electronic devices, including a USB drive storage device. This evidence revealed that the defendant possessed and reviewed Islamic extremist materials, including propaganda material of the Islamic State of Iraq and al-Sham ("ISIS").[3] This included electronic information indicating the defendant's review and possession of material from Dabiq, an official ISIS propaganda publication, as well material promulgated by Al-Hayat Media, an official ISIS propaganda arm. The evidence recovered also included speeches and sermons by Anwar al-Awlaki, a U.S.-born radical Islamic cleric and prominent leader of al-Qaeda in the Arabian Peninsula ("AQAP").[4]

      C.      The Defendant's Federal and State Charges and Guilty Pleas

On August 26, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with the following crimes: (1) Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); (2) possessing, brandishing and discharging a firearm in furtherance of a crime of violence, to wit: the Hobbs Act robbery charged in Count One, in violation of 18 U.S.C. §§ 924(c)(i)-(iii) (Count Two); (3) theft of a firearm that moved in interstate commerce, in violation of 18 U.S.C. § 924(l) (Count Three); and (4) possession of a firearm by a noncitizen illegally or unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5). On that same date, a grand jury sitting in New York returned an indictment charging the defendant with three counts of attempted aggravated murder, three counts of first-degree attempted murder, two counts of second-degree criminal possession of a weapon and other related charges under New York state law. See People v. Dzenan Camovic, Ind. No. 00928-2020 (N.Y. Sup. Ct.).

---

      [3]      ISIS is a designated foreign terrorist organization ("FTO") that, since 2013, has conducted terrorist attacks as part of ISIS's goal of forming an Islamic state. ISIS has claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad.

      [4]      Al-Awlaki, who was killed on or about September 30, 2011, is still commonly regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad.

3

The defendant entered plea agreements in both federal and state court as part of a global disposition of both proceedings, with the intent that the defendant receive a total period of incarceration of thirty years' imprisonment. On March 15, 2022, the defendant pled guilty, pursuant to a plea agreement under Rule 11(c)(1)(C), to Counts One and Two of the federal indictment. In the plea agreement, the parties agreed to request that the Court (1) sentence the defendant to 360 months' imprisonment, less the amount of time since the defendant's incarceration on June 4, 2020; (2) order that the sentence run concurrently to any future anticipated state sentence; and (3) recommend the defendant serve his sentence in federal custody, where he is currently held. On or about March 16, 2022, the defendant pled guilty in Brooklyn Supreme Court to several of the charged New York state criminal offenses, and is expected to be sentenced after sentencing in federal court. It is the government's understanding that the defendant expects to receive a sentence of thirty-years imprisonment in state court, which will be ordered to run concurrently with the preceding federal sentence imposed by this Court.

II.     Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct; [and]
>
> (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary findings to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

Finally, in the case of a plea agreement that includes a specific sentence pursuant to Rule 11(c)(1)(C) – as in this case – the Court may accept the agreement if the Court is satisfied that either (1) the agreed sentence is within the applicable guideline range; or (2)(A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form. See U.S.S.G. § 6B1.2.

III. The Advisory Guidelines Range

    A. The Parties' and Probation's Guidelines Calculation

In the PSR Addendum dated August 1, 2022 ("August 1 PSR Addendum"), Probation calculated the defendant's advisory Guidelines sentencing range as follows:

Count I: Hobbs Act Robbery:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B3.1) | 20 |
| Plus: Victim sustained permanent bodily injury (§ 2B3.1(b)(3)(1)) | +6 |
| Plus: Firearm was taken or was an object of the offense (§ 2B3.1(b)(6)) | +1 |
| Plus: Official Victim Enhancement (§ 3A1.2(C)(1)) | +6 |
| Plus: Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Minus: Timely Acceptance of Responsibility (§§ 3E1.1(a) & (b)) | -3 |
| Total Offense Level for Count I | 42 |

(August 1 PSR Addendum ¶¶ 33-49).

    Count II: Discharging A Firearm In Furtherance of a Crime of Violence

The guideline for a violation of 18 U.S.C. § 924(c)(1)(A)(iii) is U.S.S.G. § 2K2.4. The guidelines sentence for this offense is the term of imprisonment required by statute which, in this case, is a minimum sentence of 10 years' imprisonment and a maximum of life imprisonment.

5

The term imposed on Count Two must run consecutive to the term imposed on Count One. See August 1 PSR Addendum ¶¶ 32, 41.

Probation further determined that the defendant's criminal history category is VI by operation of the enhancement. See August 1 PSR Addendum ¶¶ 52-53. Accordingly, Probation concluded that based on a total offense level of 43 and a Criminal History Category of VI, the defendant's advisory Guidelines range is 360 months' imprisonment to life for Count One (restricted to 240 months due to the statutory maximum sentence), to be followed by a period of ten years to life imprisonment for Count Two. See August 1 PSR Addendum ¶ 88.

The government agrees with Probation's calculation. Probation has also indicated that an upward departure may be warranted because the conduct caused a large disruption of governmental function, and because the offense was unusually heinous, cruel, brutal or degrading to the victim. See PSR ¶ 102-103. The government does not seek an upward departure, and, for the reasons discussed further below, submits that the recommended 360-month term of imprisonment is sufficient to meet the purposes of sentencing.

B. The Application of the Terrorism Enhancement

Although the parties and the Probation Department agree on the Guidelines calculation, including the application of the terrorism enhancement,[5] the government sets forth below the basis for the application of the terrorism enhancement pursuant to U.S.S.G. § 3A1.4(b).

Under Guidelines Section 3A1.4, "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the Court adds 12 levels to a defendant's offense level and increases the defendant's criminal history category to category VI. Application note 1 to Section 3A1.4 gives the term "federal crime of terrorism" the same meaning as set forth in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) defines a "federal crime of terrorism" as (a) a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (b) constitutes a violation of one or more of a long list of enumerated federal statutes. See 18 U.S.C. § 2332b(g)(5). Thus, there are two prongs to the terrorism enhancement: (1) did the offense involve, or was it intended to promote, an enumerated federal crime, and (2) was the defendant's conduct calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. The government bears the burden of proving the application of the terrorism enhancement by a preponderance of the evidence. See, e.g., United States v. Norris, 281 F.3d 357, 359 (2d Cir. 2002).

As to the first prong, while the offense of conviction is not itself a federal crime of terrorism, the terrorism enhancement applies to an offense that is "intended to promote" a federal

---

[5] The defendant stipulated in the plea agreement to the application of the Section 3A1.4(b), and in his sentencing submission to the Court, further confirmed his agreement that "although [his] crimes are not federal crimes of terrorism as defined by the statute, his crimes fall under the 'promotion' prong of Section 3A1.4."

6

crime of terrorism, in other words, "where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." See United States v. Awan, 607 F.3d 306, 313-14 (2d Cir. 2010). Here, the defendant's offense was intended to promote one or more of the following federal crimes of terrorism: (1) providing material support to a designated foreign terrorist organization ("FTO"), in violation of 18 U.S.C. § 2339B; (2) providing material support for terrorism, in violation of 18 U.S.C. § 2339A; and/or (3) committing acts of terrorism, in violation of 18 U.S.C. § 2332b(a). The evidence that the defendant intended to promote one of these federal crimes of terrorism is based on his statements during and after the attack that indicate an ideological purpose for his conduct, Camovic's consumption of jihadist propaganda, and the similarity between his attack and those promoted by terrorist organizations.

   The defendant's exclamation of "Allahu Akbar" during his unprovoked attack on multiple officers and his statement to a nurse at the hospital following the attack that he believed he had killed two police officers, and had done for his religion, both reflect an intent to promote a federal crime of terrorism. The statements reflect a clear nexus between what the defendant intentionally did (attacked the police) and his reason for doing it (jihadism). Additionally, according to an interview with the defendant's uncle following the defendant's June 3, 2020 attack, prior to the attack the defendant asked his uncle about ISIS and other terrorist organizations, and inquired about the permissibility of killing civilians.[6]

   Materials recovered from Camovic's phone and other devices from his residence reflect Camovic's consumption of extremist jihadist media published by foreign terrorist organizations. These include official ISIS propaganda material, as reflected in images of ISIS's official propaganda publication Dabiq and its official propaganda arm Al-Hayat Media. Several images of jihadist material were recovered from the "carved" space of the defendant's cell phone, indicating they were deleted or otherwise written over. Deletion is consistent with at attempt to evade law enforcement detection and consciousness of guilt. Notably, the defendant admits that he was in possession of, and consumed, materials produced by ISIS. See PSR Addendum dated July 25, 2022 at 3 (explaining that defense counsel advised that "the defendant either listened to or downloaded numerous 'nasheeds' which were produced by al-Hayat Media Center, which is associated with ISIL" and that he "did have media from Dabiq and other sources as he browsed such sites").[7]

   Evidence of the defendant's use of TOR and other evidence of operational security is also consistent with an intent to promote a federal crime of terrorism. Foreign terrorist organizations like ISIS have long been committed to directing their followers to engage in careful operational security. The Combatting Terrorism Center at West Point notes, for example, that

---

[6] The defendant's statement to his uncle, which was recounted to law enforcement by the defendant's uncle during a voluntary interview, was not included in the PSR.

[7] "ISIL" is a reference to the "Islamic State of Iraq and the Levant," another name used by ISIS.

7

Anwar al-Awlaki used a custom encryption tool to communicate with operatives in the West, and Inspire magazine included a four-page, step-by-step tutorial on how to use it in June 2010. See "How Terrorists Use Encryption," available at https://www.ctc.usma.edu/how-terrorists-use-encryption/ (last visited July 22, 2020). In April 2015, ISIS released a 15-page guide about secure communication, and includes instructions on "how to setup Tails, connect to the Tor network to hide one's location and Internet address, create PGP keys, encrypt emails, and how to use a range of other secure communication tools." Id.

Finally, the nature of the defendant's attack on police is indicative of and consistent with the types of terrorist attacks directed by foreign terrorist organizations, including ISIS and AQAP. Specifically, well-documented and publicized statements of ISIS and AQAP exhorting followers to commit attacks using knives or other small arms, and to attack Americans in the U.S. For example, Sheikh Abu Muhammad al-Adnani, the now-deceased former spokesman and senior official of ISIS, advocated for followers to conduct knife and other "low-tech" terrorist attacks. In a September 22, 2014 speech titled "Indeed Your Lord is Ever Watchful," Adnani advocated for supporters to attack non-believers: "Smash his head with a rock, or slaughter him with a knife, or run him over with your car." As another example, in a video produced by AQAP's official media channel taking credit for the 2019 terrorist attack at Naval Air Station Pensacola—an attack involving a single attacker who shot and killed three individuals and injured several others—an AQAP spokesman ended the video with an exhortation to followers to commit knife-based attacks, and showed videos of such attacks. These attack methods have also been described in detail in 'how-to-guide' articles in English language jihadist magazines, such as in the 'Open Source Jihad' (OSJ) section of AQAP's Inspire magazine. For example, in October 2016, "Rumiyah," the online propaganda and recruitment magazine published by ISIS, told followers that holy warriors down through Muslim history have "struck the necks of the kuffar" in the name of Allah, with "swords, severing limbs and piercing the fleshy meat of those who opposed Islam." The magazine advised its readers that knives are easy to obtain, easy to hide, and deadly, and that they make good weapons in places where Muslims might be regarded with suspicion.

As to the second prong, the defendant's conduct was also "calculated to influence . . . the conduct of government by intimidation or coercion." The Second Circuit has explained, "[t]he conventional meaning of 'calculated' is 'devised with forethought,'" Stewart, 590 F.3d at 137; see also United States v. Siddiqui, 699 F.3d 690, 709 (2d Cir. 2012), as amended (Nov. 15, 2012) ("'Calculated' means 'planned—for whatever reason or motive—to achieve the stated object.'") (quoting Awan, 607 F.3d at 317). The term has been interpreted to be "nearly synonymous with intentional." Siddiqui, 699 F.3d at 709 (collecting cases). There is no requirement that what is "calculated" have taken any significant length of time: "the terrorism enhancement is applicable where a defendant acts according to a plan—whether developed over a long period of time or developed in a span of seconds—with the object of influencing government conduct or retaliating against a government." Id. (affirming application of enhancement where evidence indicated defendant decided to commit crime no later than night before conduct).

Here, the defendant deliberately targeted law enforcement for a violent and deadly attack in the midst of social unrest. As noted above, there is substantial evidence before, during and after the attack, that the defendant targeted law enforcement due to his interest in radical

8

jihadism and the foreign terrorist organizations that promote such conduct, and that he therefore was attempting to intimidate or coerce the government.

Accordingly, and as stipulated in the plea agreement, the terrorism enhancement applies to the defendant's conduct. This results in a guidelines range of 360 months to life imprisonment.

IV. The Court Should Accept the Plea and Sentence the Defendant To Thirty Years' Imprisonment

The government respectfully submits that the Court should accept the plea agreement and impose a sentence consistent with the terms of that agreement.

Rule 11(c)(3)(A) of the Federal Rules of Criminal Procedure provides that, if presented with a plea agreement pursuant to Rule 11(c)(1)(C), "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Section 6B1.1(c) of the Guidelines mirrors the language of Rule 11(c)(3)(A). Section 6B1.2(c) of the Guidelines sets forth the standards for acceptance of a Rule 11(c)(1)(C) plea agreement. As pertinent here, Section 6B1.2(c) provides that "the court may accept the agreement if the court is satisfied either that: (1) the agreed sentence is within the applicable guideline range; or (2) (A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form." Whether to accept a plea agreement rests within the Court's discretion. See United States v. Severino, 800 F.2d 42, 45 (2d Cir. 1986); United States v. Torres-Echavarria, 129 F.3d 692, 696 (2d Cir. 1997). However, "[d]eference ought to be paid to sentencing bargains because prosecutors are in the best position to make decisions about what sentence to pursue in plea negotiations." United States v. Espar, Inc., 15-CR-28 (JG), 2015 U.S. Dist. LEXIS 30469, at *2 (E.D.N.Y. Mar. 10, 2015).

The agreed-upon proposed sentence of 360 months' imprisonment is the appropriate sentence in this case, which is "sufficient, but not greater than necessary" to accomplish the goals of sentencing as reflected in the Section 3553(a) factors. To begin with, the proposed 360-month sentence is "within the applicable Guidelines range," and therefore is consistent with the sentence recommended for the defendant's conduct. U.S.S.G. § 6B1.2(c)(1).

The proposed sentence is justifiable for several additional reasons. A 30-year sentence appropriately addresses each of the Section 3553(a) factors, including the nature and circumstances of the offense and the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.

Critically, the agreed upon sentence reflects the seriousness of the defendant's conduct, which was indisputably grave and could have resulted in the deaths of multiple police officers, bystanders and the defendant himself. Indeed, the defendant's unprovoked, violent attack on police officers who were doing their job in the middle of multiple crises in New York City

9

demands a sentence that reflects the gravity of the crimes of conviction and punishes them. The proposed 30-year sentence accomplishes that.

Additionally, the proposed sentence is also sufficient but not greater than necessary to deter such attacks in the future by making unambiguously clear to any future attacker that violent crimes intended to promote terrorism will be dealt with swiftly and harshly, and result in decades of incarceration. The sentence will also specifically deter this defendant from committing such attacks in the future, and will result in his removal from the United States once he has served his sentence.

By the same token, the proposed sentence properly accounts for certain mitigating facts in this case, such as the defendant's medical history, which are discussed more fully in the defendant's submission.

Finally, the agreed-upon resolution will obviate the need for two separate complex trials of the same defendant, each of which would involve extensive testimony by the multiple victim-officers who have already suffered enormously as a result of the offenses in this case.

V.     Conclusion

In sum, and for all the reasons detailed herein, the government respectfully requests that the Court accept the Rule 11(c)(1)(C) plea agreement; impose a total sentence of 360 months' imprisonment, less the amount of time since the defendant's incarceration on June 4, 2020 (i.e. less 26 months); order that the sentence run concurrently to any future anticipated state sentence; and recommend the defendant serve his sentence in federal custody.

                Respectfully submitted,

                BREON PEACE
                United States Attorney

By:     /s/ Craig R. Heeren
                Craig R. Heeren
                Artie McConnell
                Josh Hafetz
                Assistant U.S. Attorney
                (718) 254-7000

cc:    Clerk of Court (by ECF)
       Defense counsel (by email)